BALDWIN, Circuit Judge.
This is an appeal from an order of the United States Claims Court, 9 Cl.Ct. 585, enjoining the government agency involved from awarding a contract to a contractor other than appellee NKF Engineering, Inc. (“NKF”). The order requires the injunction to remain in effect until the contracting officer (“CO”) on remand either (1) reexamines NKF’s original disqualification after ascertaining whether NKF’s bid was tainted by inside information or (2) puts aside the offers received and calls for another round of best and final offers.
The United States (“government”) appeals from the basic injunction and challenges the remand instructions. Cross-appellant NKF focuses its challenge on the order’s remand, including its authorization for the CO (1) to disregard an earlier finding of the Court that inside information was not passed, (2) to elicit new offers, and (3) to disqualify NKF without prior referral to the Small Business Administration (“SBA”).
We vacate that portion of the order enjoining the agency from awarding the contract to someone other than NKF. That in effect allows the agency to pursue its original award to Weidlinger Associates (“Weidlinger”) and moots the government’s challenge to the remand instructions as well as NKF’s cross-appeal.

Background

The factual part of this “Background” consists of Claims Court findings that are either uncontested or have not been shown by the parties to be clearly erroneous.
In March, 1983, the Naval Sea Systems Command (“NAVSEA”) issued a Request For Proposals N00024-83-R-4175(Q) (“RFP 4175”). The request called for technical and cost proposals to provide engineering services in support of Navy ships and ship systems. It originated in a subgroup of NAVSEA identified “SEA 55X.”
In May, 1983, five proposals were submitted, including those of NKF and Weidlinger, two small business concerns. The proposals were evaluated both technically and on the basis of cost. RFP 4175 was conducted by negotiation rather than by formal advertised bidding.
SEA 55X had as its deputy director a Mr. Yip Park—a civilian employee of the Navy with approximately 30 years of experience in the field of weapons effects and ship survivability and protection. Mr. Park was designated the CO’s Technical Representative ("COTR”) for RFP 4175. In addition, he chaired the Contract Award Review Panel (“CARP”), the group charged with overseeing the contractor selection process. In those dual capacities, Mr. Park’s responsibilities included development of the following matters pertaining to RFP 4175: the evaluation plan pursuant to which the offerors’ initial technical proposals were to be evaluated, the government’s estimates of the “labor mix”[1] and the range of costs it considered reasonable, and the technical vs. cost weighting formula. In his role as CARP chairman, Mr. Park learned the number of offerors who had chosen to participate in the procurement effort and their relative rankings following initial evaluation. Mr. Park knew that of the five offer *374 ors involved, two—NKF and Weidlinger— had received nearly identical rankings on their technical proposals but NKF was more than $2.5 million higher on cost.
In late August, 1984, roughly one year after the initial round of proposals had been received and evaluated by the government, Mr. Park contacted NKF and several other private companies concerning possible employment with them.[2]
During the interviewing process, Mr. Amir (the president of NKF) asked Mr. Park to check with appropriate NAVSEA officials to verify that NKF’s employment of Mr. Park would not create a conflict of interest. Although he in fact never checked, Mr. Park later informed Mr. Amir that he had received assurances from NAVSEA legal counsel. With that confirmation, Mr. Amir offered Mr. Park a nonexclusive consulting job, and they soon signed an employment agreement. At that time, neither Mr. Amir nor anyone else at NKF was aware that Mr. Park had involvement with RFP 4175 beyond having knowledge of its technical requirements as stated in the contract’s “Scope of Work.” Mr. Park nevertheless maintained his dual status as CARP chairman and COTR until his retirement from government service on September 30, 1984.[3]
Some three months after Mr. Park began work with NKF, the contracting officer (Mr. Lloyd) requested (in January, 1985) the submission of best and final offers. Included as part of that request was an amendment to the solicitation, “Amendment 5,” which revised the Statement of Work contemplated. Amendment 5 increased the importance of a particular low-cost technical area of the work statement, and necessarily decreased the relative importance of the high cost technical areas. NKF and Weidlinger viewed Amendment 5 as requiring a revision of their initial proposals.[4] Also included in the request for a best and final offer sent to NKF was an attachment in which the government identified aspects of NKF’s initial cost proposal judged to be in need of reevaluation and improvement.
NKF re-costed its proposal, an effort that led to a price reduction from $16.7 million initially to $11.2 million—a downward revision of approximately 33 percent—and gave NKF the lowest cost proposal. The other offerors also reduced their final price, but none by more than 19 percent.
In the technical evaluations of the best and final offers, Weidlinger received the highest score; NKF was rated second. However, when the CARP met and applied its predetermined weighting formula to both the technical and cost criteria, NKF received the highest overall score. Accordingly, on July 2, 1985, the CARP issued its final report recommending an award to NKF.
Shortly after that report, the contract negotiator (Mr. Dennard) voiced his concern about a possible conflict of interest involving NKF. He discussed the problem with Mr. Mills, head of the contracts division responsible for RFP 4175 and supervisor of the contracting officer (Mr. Lloyd). Mr. Mills then reviewed the situation with CARP members and, with the concurrence of Mr. Lloyd, Mr. Saul (legal advisor), Mr. *375 Dennard, and another, decided to disqualify NKF on the ground of conflict of interest.
Mr. Mills had never before seen a price swing as extreme as NKF’s 33 percent decrease. Because of Mr. Park’s prior involvement in RFP 4175 as a NAVSEA employee, Mr. Mills considered the decrease suspicious, i.e., that it was probably the result of Mr. Park’s having passed on “inside” information to NKF. Mr. Mills concluded that this appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged. In his view, the only way to eliminate the harm was to disqualify NKF. The determination to disqualify was reviewed by the Deputy Commander for Contracts, NAVSEA, and the Commander of NAVSEA.[5] Subsequently, the contracting officer announced a proposed award to Weidlinger, the second-highest bidder, by notice dated August 19, 1985.
On August 26, 1985, NKF filed a protest of the proposed award to Weidlinger with the General Accounting Office (GAO). On December 9, 1985, GAO denied NKF’s protest, and on the following day NKF filed suit in the Claims Court.
Preliminarily, the Claims Court rejected Weidlinger’s arguments that NKF had “unclean hands” based on an alleged violation of the Ethics in Government Act, particularly 18 U.S.C. § 208(a). That section, inter alia, imposes criminal liability on one participating “personally and substantially” as a government employee in a contract in which, to his knowledge, any organization with whom he is negotiating prospective employment has a financial interest. The Claims Court found no violation because Park was not “substantially and personally” involved with RFP 4175 during his employment negotiations (August-September 1984) with NKF. It also rejected Weidlinger’s argument of waiver based on NKF’s failure to acquire the government’s written approval before hiring Park; the Claims Court ruled that no such requirement existed.
The Claims Court posited the critical issue as whether NKF proved that the agency’s procurement decision was irrational in fact or erroneous in law. The Claims Court read the agency’s decision as resting on both the appearance of an impropriety (appearance of exchange of price information) and an actual impropriety (exchange of price information). It concluded that (1) appearance of impropriety, alone, is an insufficient basis to disqualify a bidder and (2) the CO’s decision that an actual impropriety occurred was not based on all relevant facts and, hence, was arbitrary and capricious. The Claims Court ordered that no contractor but NKF should be awarded the contract. Nevertheless, it remanded to the CO. It said that NKF could still be disqualified, depending on whether NKF actually received inside information from Mr. Park and that the CO should make that fact determination after considering relevant facts (including those he ignored before). Hence, the Claims Court order stated that it “shall remain in place until the contracting officer either (i) reexamines NKF’s disqualification pursuant to the instructions below, or (ii) proceeds with a resolicitation of best and final offers from all interested parties.”

Issue

Whether the Claims Court erred in reversing the CO’s decision to disqualify NKF because of an appearance of impropriety.[6]

Opinion

NKF’s suit is in essence one for breach of an implied contract to treat its *376 bid fairly and honestly. See, e.g., National Forge Co. v. United States, 779 F.2d 665, 667 (Fed.Cir.1985); CACI, Inc.-Federal v. United States, 719 F.2d 1567, 1573 (Fed. Cir.1983); United States v. John C. Grimberg, 702 F.2d 1362, 1367 (Fed.Cir.1983). A breach occurs in such situations if the contracting agency acts in an arbitrary and capricious, i.e., irrational or unreasonable, manner in rejecting the bid. See, e.g., National Forge Co. v. United States, 779 F.2d 665, 667 (Fed.Cir.1985); CACI, Inc. Federal v. United States, 719 F.2d 1567, 1573 (Fed.Cir.1983); Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct.Cl. 1980); Keco Industries, Inc. v. United States, 492 F.2d 1200, 1203-04 (Ct.Cl.1984). The Claims Court should be allowed to enjoin the agency from awarding contracts, and thereby to interfere with the procurement process, “only in extremely limited circumstances.” CACI, Inc. Federal, 719 F.2d at 1581 (quoting United States v. Grimberg, 702 F.2d 1362, 1372 (Fed.Cir. 1983)).
The Claims Court found such circumstances here. It determined that the bid rejection, to the extent based on an appearance of impropriety, was unreasonable because CACI, Inc.-Federal, though allowing bid rejections based on actual improprieties, prohibits a bid rejection based merely on the appearance of impropriety. We reject that view of CACI, Inc.-Federal.
In CACI, Inc.-Federal, the Claims Court enjoined the agency’s award of a contract to the successful bidder based on a conflict of interest, but this Court reversed. After noting that “a major thrust of the decision of the Claims Court was that there were both the opportunity for and the appearance of impropriety in that process,” this Court concluded “that there was no appearance of or opportunity for impropriety that would warrant enjoining the award.” Id. at 1575. It added that:
the Claims Court ruling that the Department’s award of the contract to Sterling would be ‘arbitrary, capricious, and an abuse of discretion’ because of the possibility and appearance of impropriety is not supported by the record and therefore is not a proper basis for enjoining the award of the contract.
Id. at 1581-82. It added that the Claims Court “based its inferences of actual or potential wrongdoing by the Department on suspicion or innuendo, not on hard facts” and its analysis “was clearly erroneous and did not justify an injunction against the government’s award of the contract.” Id. at 1582.
We read CACI, Inc.-Federal as merely prohibiting the agency from rejecting the relevant bidder where the facts of the case do not support a finding of an appearance of impropriety. That is not to say that such prohibition applies in all eases—the result would depend upon the circumstances in each case. Indeed, our vacating the Claims Court order in this case is consistent with the reversal in CACI, Inc.-Federal. In both cases, this Court finds the agency award to be based on a rational ground and Claims Court interference with the normal procurement process to be error.
Under the facts at issue here, we cannot say that the agency’s conclusion, that there was an appearance of impropriety, was unreasonable or irrational. Mr. Park had been actively involved in the procurement process on RFP 4175 and, before the contract was awarded, took a job with one of the bidders. Then, and although the proposal was changed in part by the agency necessitating cost revisions by all bidders, NKF submitted the winning bid that included a price revision of 33 percent where no other offeror decreased its bid by more than 19 percent. Whether or not inside information was actually passed from Mr. Park to NKF, the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify NKF.
NKF argues that Mr. Park was not “substantially” participating in the contract at the time he was negotiating for employment. Though that may matter for determining a violation of 18 U.S.C. § 208, it does not make irrational the agency’s conclusion that an appearance of impropriety *377 existed. Mr. Park had been a major cog in the bid process, with access to much relevant information. The drastic bid reduction followed by award of the contract to a company with whom he accepts employment has a certain aroma that is hard to purify. Certainly, announcing his retirement prior to negotiating—assuming that occurred—does not purify it. The CO was sensitive, as common sense compels him to be, to the integrity of the bidding process— an integrity attached not only to RFP 4175 but also to the bidding procedure of the entire government. That sensitivity is by no means irrational.
NKF argues that neither the terms of the solicitation nor any regulation or statute authorize its disqualification “to protect the integrity of the procurement process from the appearance of and the potential for an unfair competitive advantage.” The Claims Court responded:
Despite the seeming absence of any authority expressly authorizing the actions that were taken in this case the court is of the view that the contracting officer’s responsibility of ‘safeguarding the interests of the United States in its contractual relationships’, 48 C.F.R. § 1.602-2 (1985), is sufficient to support the exercise of authority that was asserted. What persuades us to this view is the latitude the courts have historically shown with respect to the contracting officer’s basic authority to enter into, administer, or terminate contracts, see, e.g., Arthur Venneri Co. v. United States, 180 Ct.Cl. 920, 924-25, 381 F.2d 748, 750 (1967); Sperry Flight Systems Division v. United States, 212 Ct.Cl. 329, 339-40, 548 F.2d 915, 921 (1977), and the overriding importance of the Government’s need to insure full and fair competition in the conduct of its procurements. A procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness. There can be no question, therefore, that the contracting officer had authority to act upon his concerns and, in an appropriate case, to cause the disqualification of a bidder.[7]
Though the Claims Court erroneously limited that power to cases involving actual, but not the appearance of, impropriety, we do not repeat that mistake here.
NKF argues that Congress, in creating the Ethics in Government Act, established the standards of conduct to be followed by former government employees and that the broadening of post-employment restrictions beyond the intent of Congress would have adverse effects. However, there is no indication in the Act or its legislative history that Congress intended the Act to be the exclusive means for dealing with all ethical problems. Indeed, certain areas of potential conflict—receipt of gifts and coercive use of office to name two—were not covered by the Act. See The New Federal Conflict-of-interest Law, 76 Harv.L.Rev. 1113, 1162-65 (1963). Hence, when a CO perceives a strong appearance of impropriety in a situation not precisely covered by the Act, it would undermine Congressional concern in the conflict of interest area to tie the hands of the CO.
NKF argues that the government’s formal decision to disqualify was not received by NKF until after the decision was made, violating due process. The Claims Court correctly points out, however, that “there surely was no want of due process at the administrative level.” Recognizing as a fundamental due process requirement the opportunity to be heard “at a meaningful time and in a meaningful manner,” the Claims Court correctly stated that “[t]he protest procedures before the General Accounting Office to which NKF resorted before coming here were certainly sufficient to satisfy any due process requirements *378 inherent in plaintiffs disqualification. See 31 U.S.C.A. §§ 3551-3556 (West Supp.1985) (providing for automatic stay of award and subsequent administrative review upon filing of protest with GAO).”[8]
NKF also raises the spectre of the Small Business Act, which states, at 15 U.S.G. § 637(b)(7)(A), that it is the duty of the Small Business Administration (SBA) whenever it deems such action necessary and appropriate:
To certify to Government procurement officers ... with respect to all elements of responsibility, including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern ... to receive and perform a specific Government contract. A Government procurement officer ... may not for any reason specified in the preceding sentence, preclude any small business concern ... from being awarded such contract without referring the matter for a final disposition to the Administration.
NKF urges that the disqualification decision is, in essence, a determination that NKF lacked “integrity” and was not “responsible” to be awarded the contract due to its alleged receipt of inside information, and hence, the second quoted sentence of § 637(b)(7)(A) requires SBA involvement.
We reject any notion that the SBA had to be alerted before NKF was disqualified. The disqualification here, on the basis of appearance of impropriety, had nothing to do with NKF’s status as a small business, or its ability to perform the contract. Indeed, it did not even relate to NKF’s integrity. Rather, it focused on the integrity of the bidding system, and was part of an effort to keep the perception of it pure in the minds of the public. In such circumstances, the statute does not require that the CO should have to receive input from the SBA before disqualification. Moreover, the Claims Court in Electro-Methods, Inc. v. United States, 3 Cl.Ct. 500, 508 (1983) rejected the need to defer to the SBA before suspending because Electro’s status as a small business was not involved:
The Court of Claims in Siller Bros. [, Inc. v. United States, 655 F.2d 1039 (1981) ], 655 F.2d at 1044 stated that the purpose of the 1977 amendments to the Small Business Act was to end ‘the discrimination against small business that existed because contracting officers had barred those businesses solely because of their smallness and disabilities allegedly resulting from that fact.’ Plaintiff’s status as a small business enterprise is not the cause of its suspension.
In affirming on that point, though reversing on another, this Court stated that “[t]he Claims Court correctly held that the Air Force’s suspension of Electro had nothing to do with Electro’s status as a small business enterprise, but everything to do with its possible involvement in criminal activities.” 728 F.2d 1471, 1476 (Fed.Cir. 1984).

Conclusion

The CO’s decision to disqualify NKF because of an appearance of impropriety was not irrational, arbitrary or capricious. Consequently, the Claims Court order overturning that decision was erroneous and is vacated.
VACATED
*379 ATTACHMENT

Excerpt from agency’s formal determination to disqualify

NKF’s proposed cost decreased by 33% between their original proposal and their Best and Final Offer. NKF’s proposed costs are now at the low end of the Government’s internal estimate of the range of costs it considered reasonable.
NAVSEA was concerned about the potential impact of Mr. Park’s employment by NKF. It was thought that the addition of certain technical areas to the Statement of Work contained in the RFP as well as amending the Source Selection Plan would obviate the appearance of any unfair competitive advantage gained by NKF. However, one thing that could not be changed was Mr. Park’s knowledge of the relative standing of all the competitors in both the technical and cost areas as well as each firm’s strengths and weaknesses. After the initial offers were evaluated Mr. Park knew that NKF and Weidlinger were very close technically and that NKF’s proposed cost was much higher than Weidlinger’s proposed cost and outside the reasonable cost range. It could be assumed that in order for NKF to receive the award after a Best and Final [Offer] they would have to decrease their proposed cost drastically. On a previous companion solicitation for similar work NKF submitted a Best and Final Offer of $14,146,010.00 after an original offer of $16,231,042.00 representing a decrease of 12.9%. A second Best and Final cost proposal was submitted at $14,-047,998.00 representing a final decrease in cost of 13.4%. This was considered a substantial decrease in cost. The current situation reflects a decrease in cost two and one-half times greater than that represented by the previous procurement. It can be argued that some of the decrease could be attributed to a lower proposed fee or possibly a lower required level of technical expertise reflected in lower labor rates. But it is difficult to attribute a decrease of this magnitude to those factors alone. The appearance of use of inside information is strengthened by the happenstance that NKF’s cost proposal changed from the highest to the lowest end of the Government’s estimate of what would be reasonable. The likelihood that NKF knew the relative standings of their competitors regarding technical and cost evaluations is very strong and the probability that that knowledge contributed to their decision making process in preparing their Best and Final cost proposal cannot be dismissed.
It is the Contracting Officer’s duty to identify and evaluate potential organizational conflicts of interest as soon as possible and to avoid, neutralize or mitigate significant potential conflicts before award. Changing the statement of work, Source Selection Plan and evaluation factors for award was an attempt to avoid a conflict. However, the prior knowledge of competitors [sic] proposals and the evaluation results of those proposals could not be eliminated.
The Contracting Office must also be concerned about maintaining the integrity of the competitive process. Recent Congressional and media attention has focused on the perception that the Government’s source selection process may at times be biased as well as that certain Government employee’s [sic] may make certain decisions or take certain actions in their official capacity to enhance their post-Govemment employment prospects. Under the circumstances of this acquisition, it is not possible to make award to NKF without causing such an appearance. Award to NKF would seriously harm the integrity of the competitive system because of the strong appearance of impropriety. ‘Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgement, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it’ (FAR 9.504). One of the underlying principles is preventing an unfair competitive advantage. The fact that NKF hired the Chairman of the CARP during the *380 source selection process, and then dropped their cost so drastically, much more than they would have been expected to under normal circumstances, indicates a strong possibility that they were aware of information which gave them an unfair competitive advantage and therefore damages the integrity of the proposal system.
Conclusion: From the representation of facts presented it appears that NKF obtained information not in the possession of their competitors thereby creating an unfair competitive advantage. The appearance of unfair competitive advantage is certainly inescapable. An award to NKF would raise serious question and damage the integrity of the competitive proposal system.

. The ‘labor mix” represents the government’s estimate of the amount of contract services (expressed in percentages) that it expects to require from each of the several labor categories described in the request for proposals,

. The Claims Court also found that, at about the same time, Mr. Park announced his retirement. The government challenges that finding as clearly erroneous. Whether clearly erroneous or not, our result in this case is the same. Hence, we accept the finding of the Claims Court for purposes of the appeal.

. There is some discrepancy on when he was replaced as CARP chairman. The Court’s formal findings, entered December 30, 1985, indicate it was September 26. The Court’s opinion of February 27, 1986 indicates it was September 30. The four days make no difference to our opinion.

. The government challenges whether Amendment 5 constituted a major shift in the procurement’s emphasis that dictated a major price decrease. Reviewing the government's argument on that, and NKF’s response, we conclude that the government has failed to meet its obligation on appeal to show that the findings of the Claims Court relating to Amendment 5 were clearly erroneous.

. Attached to this opinion is a substantial excerpt from the government’s formal determination to disqualify, signed by Messrs. Lloyd, Dennard, Mills and Saul.

. Because we answer that question in the affirmative, and in effect allow the agency to effectuate the CO’s decision, it is unnecessary to address the other issues on appeal, e.g., (1) whether the Claims Court erred in concluding that there was no violation of the Ethics in Government Act, 18 U.S.C. § 208; and (2) alleged errors in the remand instructions.

. NKF would read Arthur Venneri Co. and Sperry Flight more narrowly than did the Claims Court. We do not accept NKF’s unduly restrictive interpretation. Although neither case can be construed broadly enough to confer totally unfettered authority on the CO, both cases evidence our predecessor court’s understanding that the CO’s authority to manage the contract process is broad.

. NKF cites a number of cases in support of its due process argument, some of which were recently cited by this Court in a due process context in S.A.F.E. Export Corporation v. United States, 803 F.2d 696, 699 (Fed.Cir.1986). Those cases involved bidders that were effectually barred or suspended from government contract work due generally to charges that they in fact lacked responsibility or integrity (as opposed to the present situation of a bidder prevented from performing one contract because of appearance of impropriety). No cited case was decided before the effective date of the 1984 amendments to GAO’s bid protest system that enhanced the protest mechanism—and opportunity to be heard at the administrative level—for actual or prospective bidders like NKF. Nor did a cited case expressly address whether any GAO bid protest system in effect at the time, applicable to debarments or suspensions, provided adequate due process safeguards.