**JOSEPH L. DeCLERK AND ASSOCIATES, INC.,
Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 649–88C.**

United States Claims Court.

April 22, 1992.

Jay R. Schmerler, Belmar, N.J., attorney of record for plaintiff.

Paul D. Scott, Civil Div., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson, and Director David M. Cohen, attorneys of record for defendant.

## OPINION

HORN, Judge.

Plaintiff, Joseph L. DeClerk and Associates, Inc. (JDC), seeks judgment against the defendant, the United States, to recover the bid preparation costs it incurred in responding to a government solicitation for the fielding of a Single Channel Ground and Airborne Radio System ("SINCGARS"), as well as lawful interest, and reasonable attorney's fees. Plaintiff alleges that the defendant breached its contractual duty to judge fairly all bids submitted in response to the solicitation for bids, and that an implied contract existed between plaintiff and defendant. Plaintiff further alleges that the defendant violated the Competition in Contracting Act of 1984, 41 U.S.C. § 253 (1988), by certain actions, inactions and misrepresentations, which, according to the plaintiff, resulted in the arbitrary and capricious award of the contract to a party other than the plaintiff.

During the trial, at the close of the plaintiff's case, but prior to the presentation of the defendant's case, the defendant made a Motion to Dismiss, pursuant to former Rule 41(b) of the Rules of the United States Claims Court (RUSCC),[1] on the grounds that the plaintiff had shown no right to relief upon the facts and law, as presented at trial. Based on a review of the submissions of the parties, the evidence presented during the plaintiff's case at trial, and a review of the relevant facts and legal precedent, the court granted the defendant's motion. Upon request, the court has reduced its oral Opinion to writing below.

## BACKGROUND

Plaintiff is a New Jersey Corporation, which engages in business related to engineering, computer and fielding services for government and private entities.[2]

On May 29, 1985, the United States Army Communications–Electronics Command ("CECOM"), Fort Monmouth, New Jersey, issued Solicitation No. DAAB07–85–R–K040 (Solicitation K–040). Contract DAAB07–86–CR005 was ultimately awarded. At first, Solicitation K–040 called for a twelve month contractor effort to field the SINCGARS, with an option for six additional months of work related to the same task. The performance period subsequently was changed to an eleven month base period, with a twelve month option period. The procurement was specifically designated as a one-hundred percent set-aside for small business. Solicitation K–040 directed interested parties to submit their proposals on or before July 1, 1985. Modification No. 0003 to Solicitation K–040 notified interested contractors that the closing date for proposals was extended to July 8, 1985.

The government solicited offers from fifty-three contractors. Three contractors responded in a timely manner by the July 8, 1985 deadline: the plaintiff, Joseph L. DeClerk & Associates, Inc., Nations, Inc. and Eagle Technology, Inc.

The proposers under Solicitation K–040 were asked to address the base effort and

---

1. On March 15, 1991, and then again on March 15, 1992, revised Rules for the United States Claims Court went into effect. Among the changes in the 1992 revision were changes to Rule 41(b). Although the substance of the Rules remain the same, and in accordance with the Rules, the court can still dismiss the case at the end of the presentation of plaintiff's case, following the 1992 revision, the pertinent language is now included in RUSCC 52(c).

2. As stipulated by the parties, the fielding of equipment entails all the steps required to take a finished product from a manufacturer and place that product in the hands of the field soldiers, ready for use. For example, fielding includes the receipt of the radios from the manufacturer, the inventorying of the radios and corresponding parts, the preparation of military units for the receipt of the radios, delivery of the radios and installation of the radios.

the option effort. According to the Joint Stipulation of Facts submitted by the parties, selection was to be based upon the best overall proposal, with consideration given to technical, cost and management factors. Technical factors were to be given greater weight than the other two factors combined. The announced point system under which the proposals were evaluated had a potential total of 100 points, distributed as follows:

1. Technical (65 points)
   (1) Technical approach (35 points)
       (a) Feasibility of approach (20 points)
       (b) Understanding of problems (10 points)
       (c) Completeness (5 points)
   (2) Personnel (15 points)
   (3) Material and facilities (5 points)
   (4) Technical man-hours (10 points)
2. Cost (25 points)
   (1) Cost Proposal (15 points)
   (2) Cost Realism (10 points)
3. Management (10 points)
   (1) Past Performance (10 points)

Technical evaluations were performed by the Source Selection Evaluation Board (SSEB), which was chaired by Lieutenant Colonel John A. Reid of the Readiness Directorate of CECOM. Cost evaluations were performed by the Procurement Branch of CECOM.

The Procurement Branch of CECOM was notified on August 2, 1985 that the initial technical evaluations of the three proposals were complete and submitted by the SSEB. Plaintiff, DeClerk, at first received an overall "susceptible" rating. Eagle received an overall "acceptable" rating. Nations received an overall "superior" rating. On the seven categories evaluated and rated, plaintiff received three "acceptable" ratings, three "susceptible" ratings and one "unacceptable" rating. The initial ratings of the three proposals were as follows:

|  | NATIONS | JDC | EAGLE TECHNOLOGY |
| --- | --- | --- | --- |
| Feasibility of Approach | Superior | Susceptible | Acceptable |
| Understanding of Problem | Superior | Susceptible | Acceptable |
| Completeness | Acceptable | Susceptible | Acceptable |
| Personnel | Superior | Acceptable | Susceptible |
| Materials and Facilities | Acceptable | Acceptable | Acceptable |
| Technical Manhours | Superior | Unacceptable | Acceptable |
| Management | Superior | Acceptable | Acceptable |
| OVERALL | SUPERIOR | SUSCEPTIBLE | ACCEPTABLE |

By letter dated August 13, 1985, E.T. Kofron, the government contracting officer for this project, notified plaintiff of thirteen technical Items for Negotiation (IFN) and invited plaintiff to provide responses to the areas of concern identified on or before August 26, 1985. Plaintiff submitted its revisions on time, and the Readiness Directorate performed a second technical evaluation of DeClerk's proposal. The contracting officer then advised plaintiff of certain items in need of still further clarification. Plaintiff responded on or about October 24, 1985.

A revised technical evaluation of the proposals of plaintiff, Eagle Technology and

Nations, Inc. was completed on November 20, 1985. In particular, the government stated that DeClerk's proposal "conflicts itself" regarding travel expense projections and indicated that if plaintiff was awarded the contract, the government would have to engage in a significant amount of training of plaintiff in material fielding. The second evaluation stated in full:

OFFEROR: Joseph L. DeClerk & Associates (JDC)

1. The graduated man loading proposed by JDC would provide for adequate personnel to support the FY 86 level of effort for SINCGARS. The evaluation projects that three (3) MFT's should be sufficient to execute the FY 87 fieldings.

2. Page 4 of the proposal states that the solicitation is deficient in that travel requirements are not an evaluation factor. It is the understanding of the evaluation team that the opposite is in fact correct. All other offerors presented detailed travel projections. The JDC proposal conflicts itself on page 3 when it states in the same paragraph that because of their dispersed location JDC will minimize travel costs, and then states that significant travel will be incurred by their PM, Team Chiefs and Supply Specialists.

3. The JDC proposal at figure 4–1 states that New Materiel Introductory briefings will be conducted on site at least three (3) months prior to fielding. Throughout their numerous technical submissions, JDC has failed to realize that this briefing is the responsibility of the Project Manager and is scheduled at least eighteen (18) months prior to fielding. Follow-on briefings are the responsibility of the materiel fielding team.

4. While JDC has provided enough information to allow for an 'ACCEPTABLE' rating, the evaluation team expects that if JDC is the successful [sic] offeror, the government would be required to spend considerable effort training of this company in materiel fielding.

With respect to Nations, Inc. and Eagle Technology, the revised technical evaluation stated:

OFFEROR: NATIONS, Inc.

1. The revised proposal submitted by NATIONS, Inc. is acceptable to the evaluation team.

2. The graduated man loading approach is quite feasible and is applied such that adequate management and execution of the fielding effort can be accomplished. Of particular note to the NATIONS response is the thoroughness they exhibit by addressing each element of the Statement of Work in light of the revised requirement.

OFFEROR: Eagle Technology

1. The revised proposal submitted by E–Tech is acceptable to the evaluation team.

2. In their proposal E–Tech indicates that they understand how a material fielding program can be effected by delays in other parts of an entire program. The E–Tech staffing proposal on a graduated basis will provide adequate program coverage in FY86 in preparation for the FY87 on site fielding efforts. Of particular note is the E–Tech understanding that supply work must still be accomplished in FY86 and their provisions for covering that area.

Letters, dated November 21, 1985, advised plaintiff and the other contractors to submit their Best and Final Offers by December 4, 1985. In a separate letter of the same date, the contracting officer reconfirmed an earlier telephone conversation and directed DeClerk to address certain "areas which were discussed" in its Best and Final Offer. In particular, the letter requested plaintiff to list its travel estimate in greater detail in order to demonstrate its reasonableness, to break down its subcontractor cost, to set forth the labor escalation rates for both the prime and subcontractor, and to submit a grand total for the entire effort. The letter requested that the cost proposal be submitted in the following format:

*CLIM 0001 Base Year*

(A) DIRECT LABOR (Prime Contractor)
Labor Categories & Respective Hours × Flat Rate.

Give Sum of DL

(B) OVERHEAD

Expressed in Dollars and as a % of Direct Labor

(C) TRAVEL FOR PRIME CONTRACTOR

(D) OTHER DIRECT COSTS

Give not only the Dollar Total but also an explanation of what cost elements fall into this category.

(E) G & A Expressed in Dollars and as a % of the G & A cost pool (A thru D)

(F) PROFIT Expressed in Dollars and as a % of total cost.

(G) SUBCONTRACTOR COST * * Expressed in Total Dollars

SUM A THRU G TO GIVE THE TOTAL COST FOR CLIN 0001

The final technical evaluations were completed by the Readiness Directorate on January 3, 1986. The Source Selection Authority (contracting officer) ranked the proposals in the following declining order: 1) Nations, Inc.—superior; 2) Eagle Technology—acceptable; 3) Joseph DeClerk & Associates—acceptable.

In a letter dated January 17, 1986, the contracting officer informed plaintiff that Nations, Inc. was the successful offeror. Plaintiff lodged a protest with the General Accounting Office ("GAO") on January 22, 1986. In the GAO protest, plaintiff sought a set-aside of the award, or alternatively, an award of bid preparation costs. On February 14, 1986, plaintiff received formal notification that Nations, Inc. was the successful offeror. Subsequently, plaintiff was granted a debriefing by CECOM regarding Solicitation K–040, which took place on April 29, 1986. The contracting officer attended the session.

On February 10, 1986, the GAO issued a decision on the protest lodged by DeClerk in favor of the Government. Plaintiff then petitioned for reconsideration on February 12, 1986. The GAO reaffirmed its initial findings in a decision dated February 26, 1986.

3. *See* footnote 1.

4. Since Rule 41(b) was closely patterned upon Fed.R.Civ.P. 41(b), precedent under the Fed.

Plaintiff filed a complaint in the United States District Court for the District of New Jersey. The case was later dismissed, without prejudice. Plaintiff subsequently filed the instant complaint in the United States Claims Court. Discovery was completed and the parties submitted the pretrial filings. At the close of the presentation of plaintiff's case, the defendant made a Motion to Dismiss, pursuant to former RUSCC 41(b).[3] After a review of the evidence presented at the trial and the relevant precedent, the court granted the defendant's motion. The defendant then filed its written Motion to Dismiss, confirming its oral Motion to Dismiss made the day before. The plaintiff responded, also in writing. The decision of the court, issued orally at the trial, is reduced to writing in the instant opinion.

## DISCUSSION

Following the conclusion of the presentation of the plaintiff's case, the government made a Motion to Dismiss. Rule 41(b) of the Rules of the United States Claims Court (RUSCC), as it was in effect at the time the above captioned case was tried, provided, in pertinent part:

After the plaintiff has completed the presentation of his evidence, defendant, without waiving its right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law, the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

RUSCC 41(b).[4]

RUSCC 41(b) allows the defendant to move for judgment or involuntary dis-

R.Civ.P. 41(b) is relevant to interpreting RUSCC 41(b). *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Li-*

missal prior to putting on its own case. In general, dismissal pursuant to RUSCC 41(b) may be appropriate in the following situations: first, when a plaintiff has not demonstrated, in fact or in law, the elements of the claim as filed and has, therefore, failed to substantiate entitlement to relief; or, second, when a plaintiff's own evidence establishes one of the defendant's defenses, as a matter of fact or law. *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70–71 (1989) (citing *CMS Softwear Design Systems, Inc. v. Info Designs, Inc.*, 785 F.2d 1246 (5th Cir.1986)).

█ A dismissal under Rule 41(b) differs from a directed verdict in a jury trial because on a Rule 41(b) motion the court does not have to decide that the defendant is entitled to judgment as a matter of law. Instead, the court, as the finder of fact, may resolve disputed issues of fact. *Lichtefeld–Massaro*, 17 Cl.Ct. at 70 (citing *duPont v. Southern Nat. Bank of Houston, Tex.*, 771 F.2d 874, 879 (5th Cir.1985)). In *Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565 (Fed.Cir.1984), the Court of Appeals for the Federal Circuit carefully analyzed the distinction between a judgment entered pursuant to Rule 41(b) and a directed verdict:

> A judgment under that rule [Fed.R.Civ.P. 41(b)] need not be entered in accordance with a directed verdict standard, notwithstanding the pleasant symmetry with jury practice of Stearns' argument to the contrary. Rather, the trial judge in deciding such a motion in a nonjury case may pass on conflicts of evidence and credibility.
>
> Prior to the 1946 amendment of Fed. R.Civ.P. 41(b), the Third and Fourth Circuits held that the function of the court in resolving a rule 41(b) motion in a nonjury case was the same as in a motion for a directed verdict on the theory that a rule 41(b) motion raised a question of law only. The 1946 amendment to rule 41(b), however, rejected that approach and eliminated any doubt that the role of the court is quite different from its role in

passing on a motion for a directed verdict. The trial judge, in passing on a rule 41(b) motion in a case tried to the court, may weigh and consider the evidence and sustain defendant's motion even though plaintiff's evidence establishes a prima facie case that would preclude a directed verdict for defendant in a jury case.

*Stearns v. Beckman Instruments, Inc.*, 737 F.2d at 1567–68; *see also, Reel–O–Matic Systems, Inc. v. United States*, 16 Cl.Ct. 93 (1989).

█ As is true in the instant case, an implied contractual condition of every request for proposals issued by the government is that each bid received by the government in response to a solicitation will be fairly and honestly evaluated. *Prineville Sawmill Company v. United States*, 859 F.2d 905, 909 (Fed.Cir.1988); *Coastal Corporation v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983); *Dynalectron Corp. v. United States*, 4 Cl.Ct. 424, 428, aff'd without op. 758 F.2d 665 (Fed.Cir. 1984); *Space Age Engineering, Inc. v. United States*, 4 Cl.Ct. 739, 741 (1984). An unsuccessful bidder who can prove that the government breached this implied contractual obligation because its conduct was arbitrary and capricious towards the bidder may recover bid preparation costs. *Coastal Corporation*, 713 F.2d at 730; *Keco Industries, Inc. v. United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566, 574 (1974) (*Keco (II)*). Plaintiff's burden of proof in showing that the government breached its duty to honestly consider plaintiff's proposal is stringent. *Space Age Engineering*, 4 Cl.Ct. at 741; *Tidewater Management Services, Inc. v. United States*, 573 F.2d 65, 67, 216 Ct.Cl. 69, 72 (1978); *Keco Industries*, 492 F.2d at 1204. Moreover, recovery for bid preparation costs is appropriate only when a plaintiff presents "clear and convincing proof" which demonstrates that the award of the contract to a contractor other than the plaintiff was "arbitrary and capricious." In *Space Age Engineering*, the court clearly articulated this standard

---

*chtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

*See also* footnote 1, above.

by stating that "[r]ecovery may be had only upon 'clear and convincing proof' that the award of the contract to another was arbitrary and capricious, thereby denying a contractor's bid the fair and impartial consideration to which it was entitled." *Space Age Engineering*, 4 Cl.Ct. at 741–42; accord, *Paxson Electric Co. v. United States*, 14 Cl.Ct. 634, 638 (1988). Likewise, the United States Court of Appeals for the Federal Circuit has confirmed this high standard in *Coastal Corporation v. United States*, by declaring that: "[t]he theory upon which a contractor may recover bid preparation costs is that the government had breached an implied contract, obligating it 'to treat a bid honestly and fairly,' because its 'conduct was arbitrary and capricious toward the bidder-claimant.'" *Coastal Corporation v. United States*, 713 F.2d at 730 (citations omitted).

In *Keco (II)*, the court set forth four factors to be considered when determining whether the government acted arbitrarily or capriciously towards the bidder-claimant: 1) whether the government procuring officials acted in bad faith, thus depriving the bidder of fair and honest consideration of its proposal; 2) whether there was a reasonable basis for the government's decision; 3) the degree of discretion given to the procurement officials by applicable statutes and regulations; 4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but which need not automatically constitute grounds for recovery. *Keco (II)*, 203 Ct.Cl. at 574, 492 F.2d at 1203–04.

In *Tidewater Management Services, Inc.*, the United States Court of Claims further analyzed ways for a plaintiff to prove that the government's action was arbitrary and capricious. The Court stated:

> Arbitrary and capricious action on the part of the Government may be shown by proof that there existed no reasonable basis for the award of the contract to another. *Continental Business Enterprises, Inc. v. United States, supra*, 452 F.2d [1016] at 1021, 196 Ct.Cl. [627] at 637–38 [ (1971) ]; *Keco Industries (II) v.*

*United States*, 492 F.2d 1200, 1203–04, 203 Ct.Cl. 566, 574 (1974). Subjective bad faith on the part of the procuring officials is such proof. *Heyer Products Co. v. United States, supra* [140 F.Supp. 409, 135 Ct.Cl. 63 (1956) ]; *Keco Industries (II) v. United States, supra*. Proof that the procuring officials violated 'pertinent statutes or regulations can, but need not necessarily, be a ground for recovery.' *Keco Industries (II) v. United States, supra*, 492 F.2d at 1204, 203 Ct.Cl. at 574.

*Tidewater Mgmt. Services, Inc.*, 216 Ct.Cl. at 73, 573 F.2d at 67.

### a. The Need for Plaintiff to Document Events of Impropriety in Order to Recover Bid Preparation Damages

Plaintiff in this case argued that a number of social events occurred, either during the solicitation process on Solicitation K–040, or during the time when Nations was performing work under contract K–029 (the predecessor to the contract issued pursuant to Solicitation K–040), which gave rise to the appearance of impropriety on the part of government officials involved in the solicitation, evaluation and award of the contract at issue. The plaintiff, therefore, claims that this court should grant bid preparation damages to the plaintiff for the defendant's wrongful award of the contract to a contractor other than the plaintiff.

Although even appearances of impropriety are to be strictly frowned upon during the bid solicitation, evaluation and selection process, it is clear that: "Indeed, while an appearance of impropriety may warrant disciplinary action against the offending federal official, in the absence of any impact on the evaluation of a proposal appearances will not sustain an award of bid preparation costs." *Dynalectron Corp. v. United States*, 4 Cl.Ct. at 430 (citations omitted). The plaintiff must be able to demonstrate that the alleged improper actions of the government, in fact, caused harm to the integrity of the selection process and, therefore, to the plaintiff. Even if it can be shown that there were errors committed in the procurement

process, that alone would not result in recovery by the plaintiff of bid preparation costs. As stated in *Keco (II)*, 203 Ct.Cl. at 573, 492 F.2d at 1203: "But if one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding process."

■ In the instant case, the plaintiff alleged that while the proposals responsive to the solicitation were being considered, Lt. Col. John A. Reid, the contracting officer's technical representative, socialized with persons employed by the incumbent contractor on contract K–029, Nations, Inc., which was also the ultimately successful bidder on Solicitation K–040. During the presentation of the plaintiff's direct case, the plaintiff presented evidence of several instances of social contact between Lt. Col. Reid and Nations employees, including an outing with a Nations' employee to a college football game, attendance at a party given by a Nations' employee, and two or three golf games played with a Nations' employee.

At the trial, during cross-examination, Lt. Col. Reid explained the circumstances surrounding the football game allegation. He stated, "I put out general invitations to my office and to the people who were working for us at Nations to meet over at my house for a brunch, and we'd go over to the ballgame and come back to my house for snacks later." He further stated that about twenty people attended this game. With regard to the party, Lt. Col. Reid first testified in an earlier deposition, that it was a Halloween party. However, subsequently, at the trial he revised his prior statement by testifying that, "[w]hen I addressed the party, I went to a party at Mr. McDonald's.[5] I was mistaken about the type of party it was. It was a St. Patrick's Day party at his house, not a Halloween party."[6] He explained his mistake, saying:

Mr. McDonald had told me that his heritage was Irish, and he was having a St. Patrick's Day party. Why I said Halloween party during the deposition, a theme party came to my mind. It was—I was trying to remember when I started my answer the different times when I had met with him other than official business. I knew that one of them had been a party.

Lt. Col. Reid then was specifically asked: "All right. I'm going to ask you again today now, Colonel Reid, and I'll remind you that you're under oath. Did you or did you not socialize with anyone from Nations at all during the period that you were considering—the government was considering the K040 solicitation?" His response was, "I did not." When asked, "[d]id you or did you not in any way favor Nations through the process of this solicitation?", Lt. Col. Reid answered, "I did not."

When questioned on direct examination about the number of times he played golf with Mr. John Place, the chief executive officer of Nations, Lt. Col. Reid indicated that he played golf two or three times with him. On cross-examination, he clarified his prior testimony by asserting that, to the best of his knowledge, three is the maximum number of times he played golf with someone from Nations, and that none of these games occurred while the contract at issue in this case was out for competitive bid. Lt. Col. Reid testified that he is an avid golfer, who plays over seventy games per year. Furthermore, he stated that he did not play golf with any employee of Nations while this contract was out for competitive bid.

As discussed above, a disappointed bidder must present actual evidence of wrongdoing in order to recover bid preparation expenses. This court should not award bid preparation costs on "suspicion or innuendo." *Dynalectron Corp. v. United States*, 4 Cl.Ct. at 430. Moreover, it has been

---

5. Mr. McDonald was the project leader or project manager for the K–029 contract for Nations.

6. The distinction between the Halloween and St. Patrick's Day parties is of importance because attendance at a Halloween party would have meant that Lt. Col. Reid was socializing with a Nations' employee during the solicitation period of the contract.

suggested that bid preparation costs should not be awarded based only on the appearance of a conflict of interest, rather than on the occurrence of an actual conflict of interest which affects the solicitation selection process. For example, in *CACI, Inc.— Federal v. United States*, 719 F.2d 1567, 1581–82 (Fed.Cir.1983), in an action to enjoin award of a contract to an apparently successful bidder, the Federal Circuit held that, based on the facts presented, the appearance of impropriety in the contract award process did not give the Claims Court the authority to enjoin a contract award. *See also Eagle Construction Corp. v. United States*, 4 Cl.Ct. 470, 481 (1984).[7]

The plaintiff, in the case at bar, maintains that Lt. Col. Reid's contacts with employees of Nations even during the performance of contract K–029 (the predecessor contract to the one awarded pursuant to Solicitation K–040) would suggest impropriety on the part of the defendant, since plaintiff believes it was obvious that Nations would be seeking additional work by means of a follow-on contract. Plaintiff, however, has failed to show specific instances of impropriety during the K–040 solicitation process which impacted on the contract award, and also has not documented improper conduct prior to the issuance of the solicitation. In support of its position, plaintiff cites to *NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed. Cir.1986), although the plaintiff acknowledges that in that case the court did not have to rule directly on the issue of the impact of the insider information allegedly available to one of the parties. In *NKF Engineering, Inc.*, the Federal Circuit upheld a contracting officer's decision to disqualify a government contractor due to the appearance of impropriety stemming from the substantial decrease in the contractor's bid price after the contractor hired a former technical representative of the contracting officer. The court decided that

the contracting officer's decision was not arbitrary or capricious, unreasonable or irrational. *Id.* at 378.

This court notes, however, several important and relevant features of the *NKF Engineering* decision which distinguish it from the case at bar. First, the court in *NKF Engineering* explicitly stated that the propriety of a decision to reject a bid based on appearances of impropriety must be based on the facts of each case. *NKF Engineering*, 805 F.2d at 376. Moreover, although *NKF Engineering* does not bar the award of bid preparation costs based on the appearance of impropriety, the case clearly does not support the proposition that the appearance of impropriety automatically supports disqualification of a contractor or award of bid preparation costs in a case in which the facts otherwise do not support such result. In fact, *NKF Engineering* addresses rejection of a bid and does not discuss the issue of whether or not to award bid preparation costs. In the instant case, given the facts and issues presented, this court must first review the record and determine whether an alleged impropriety or appearance of impropriety occurred. Then, the court must assess whether the facts surrounding the alleged impropriety or appearance of impropriety had an impact on the procurement process which rose to the level of arbitrary and capricious conduct, warranting the award of bid preparation costs.

■ Initially, the court notes that there exists a strong, albeit rebuttable, presumption of good faith regarding the official actions of public officials. In *Gaskins v. United States*, 652 F.2d 70, 227 Ct.Cl. 563 (1981), the court stated that "[t]he presumption is that government officials have acted in good faith in making their decisions. It takes almost irrefragable proof to overcome the presumption. The burden is on the plaintiff." *Id.*, 652 F.2d 70, 227 Ct.Cl. at 566. As clearly articulated in *P.*

---

7. *CACI, Inc.—Federal v. United States*, was originally interpreted to stand for the proposition that allowing bid rejections, (and therefore bid preparation recovery) based on actual improprieties, prohibits a bid rejection (or award of

bid preparation costs) based merely on the appearance of impropriety. However, the court in *NKF Engineering, Inc. v. United States*, 805 F.2d 372, 376 (Fed.Cir.1986) specifically rejected that approach.

*Francini & Co. v. United States,* 2 Cl.Ct. 1 (1983):

> A presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, it must be presumed that they have properly discharged their official duties. [Citation omitted.] In this connection, courts have said that the party attacking the legality of administrative action in the procurement field has the heavy burden of proving that such action was irrational or clearly illegal. [Citations omitted.]

*P. Francini & Co.,* 2 Cl.Ct. at 11; *see also Wathen v. United States,* 527 F.2d 1191, 1197, 208 Ct.Cl. 342, 351 (1975), *cert. den.,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976).

Nonetheless, government officials, as representatives of the taxpayers, always should monitor their own conduct strictly in accordance with the very highest standards of ethical conduct. Ideally, even the opportunity to create the appearance of a conflict of interest should be assiduously avoided. At the same time, government officials deserve the benefit of the presumption of the innocence of their actions and the regularity of the proceedings. Bid preparation costs should not be awarded to the plaintiff, absent clear and convincing proof to the contrary, and should be awarded only if there is in the record clear and convincing evidence that the contract award was arbitrary and capricious.

In the instant case, Lt. Col. Reid emphatically answered "No" when questioned as to whether he socialized "with anyone at all during [his] work on this K040 solicitation." Lt. Col. Reid testified that although he had some business contact with Nations during the solicitation period, due to work he had assigned them under the predecessor contract to the one at issue, number K–029, he did everything that he could "to remove himself from the dealings with Nations that could put either one of us in a predicament." For example, Lt. Col. Reid stated that he would send someone who worked for him to a meeting with a Nations representative, which, otherwise, he normally would have attended personally.

Based on the careful observance of Lt. Col. Reid during his testimony, the court concludes that Lt. Col. Reid came across as a credible, sincere and thoughtful witness. He appeared to the court as to have thoughtfully tried to evaluate the impact of his actions during the critical time period, in order to conduct a fair evaluation. On the witness stand, Lt. Col. Reid did not try to prevaricate or to defend himself in light of the allegations raised. He endeavored to answer all the questions posed to him truthfully and in a straightforward manner.[8]

Although the court might have preferred that Lt. Col. Reid's, albeit occasional, choice of social companions during the time the contract selection process was under way had been avoided, the court does not believe that these limited, social contacts directly affected the ultimate decision to grant the contract at issue to Nations. Moreover, the court notes that Nations, for whom some of the attendees at the football game worked, was a government contractor at the time these contacts occurred. In accordance with the broad discretion of procurement officials to determine which is the bid most advantageous to the government, this court does not think that the contracting officer's decision to award the contract to Nations was unreasonable, arbitrary or capricious, or was prejudiced by any behavior on the part of Lt. Col. Reid, or any other responsible government official.

The plaintiff had an unfettered opportunity at the trial to design the presentation of its case and to present any and all witnesses of its choosing to substantiate the claim that it was unfairly prejudiced during the selection process.[9] The record

---

8. Regarding the testimony Lt. Col. Reid offered on the date of his attendance at a college football game, the defendant voluntarily corrected Lt. Col. Reid's earlier statements in a footnote to the papers submitted by the defendant to the court in connection with the Motion to Dismiss.

9. As defendant pointed out, the plaintiff chose to call as adverse witnesses in the direct case

clearly demonstrates that although plaintiff's proposal received an acceptable rating, it was ranked lowest of the three proposals received, and was not given the "Superior" rating received by Nations, the ultimate awardee of the contract. From the outset, and throughout the evaluation process, the government procurement officials expressed serious concerns about the offer submitted by the plaintiff and about how plaintiff would perform in certain specific areas, including having to train DeClerk employees in material fielding handling, if the contract was awarded to the plaintiff. There is no indication in the record that the government procurement officials abused the broad discretion with which they were vested in the procurement process, nor that the award to Nations, rather than to the plaintiff, was unwarranted. After the conclusion of the presentation of plaintiff's evidence, it was clear to the court that the plaintiff could not sustain its claim for bid preparation costs.

b. *Lack of Equality of Information Available to Interested Contractors*

■ Plaintiff also argues that it is entitled to bid preparation costs because Nations was privy to information material to the proposal, which was not available to JDC and other interested offerors. Based on the filings of the parties, the transcript, and the exhibits available, this court does not find evidence to support such a claim. Solicitation K–040 was sent to each of the fifty-three (53) contractors solicited by the government. The evidence in the record indicates that the three contractors who responded to the solicitation, plaintiff, Joseph DeClerk & Associates, Inc., Eagle Technology, Inc. and Nations, Inc., were working from the same solicitation document. According to the testimony given at the trial, all specifications relevant to the contract, although not included in the solicitation, were available to the plaintiff, and all the other offerors, including at a library in Fort Monmouth, New Jersey, local to the plaintiff. The solicitation specifically referenced this library as having the additional materials. The solicitation stated:

L.6 AVAILABILITY FOR EXAMINATION OF SPECIFICATIONS NOT LISTED IN THE INDEX OF FEDERAL SPECIFICATIONS AND STANDARDS (FAR 52.210–04 (APR 1984)

The specifications cited in this solicitation are not available for distribution. However, they may be examined at the following location(s):

(ACTIVITY)
(COMPLETE ADDRESS)

Commander, US Army CECOM
ATTN: AMSEL–RE–FM–MI
Building 421
Fort Monmouth, NJ 07703

(TELEPHONE NUMBER)
(PERSON TO BE CONTACTED)
(TIME(S) FOR VIEWING)

201–532–5856
CWZ Ed McDonald
9:00 A.M.—12:00 P.M.

Nations, the incumbent contractor, did have certain information pertaining to the work it was performing under the predecessor contract, K–029, including jobs pertaining to the fielding of SINCGARS given to Nations by Task Assigned Memoranda (TAMS) to contract K–029. However, this information was necessary for Nations to accomplish its duties under the earlier contract K–029 and was not given to Nations for the purpose of providing Nations with additional information relevant to Solicitation K–040. The same level playing field which must be maintained to ensure prospective contractors are treated evenly and fairly must also allow an opportunity for

two of the primary witnesses in the defendant's case, Edward Kofron, the contracting officer, and Lt. Col. John Reid, the chairman of the Source Selection Evaluation Board. Furthermore, at the trial, the defendant agreed that utilizing cross-examination and any necessary additional questions, these two witnesses would be called to testify only once during the trial and could be spared the need to remain or return on a subsequent trial date. Therefore, in effect, the defendant has already presented a significant portion of its own direct case.

an incumbent contractor to compete for a subsequent, follow-on contract. A company should not be disqualified just because an existing contractual relationship exists with the defendant at the time the solicitation is issued. There is no evidence in the record that even those members of the government solicitation and evaluation team who, indeed, had prior contracts with Nations' personnel were biased in their favor. This is especially true given the government's decision not to exercise an option for Nations to continue the work included in the earlier Nations' contract, K-029, but rather to make the additional contract work subject to renewed competition by offering Solicitation K-040 to all, interested, prospective offerors.

Even if the government, accidentally, had communicated information to Nations that it did not relay to the other bidders, of which fact there is no hard evidence in the record, such mere negligence does not automatically form a basis on which to award bid preparation costs. In *Keco (II)*, the Court of Claims refused to award bid preparation damages to an unsuccessful bidder, even though the winning bidder's proposal was later modified, thereby increasing the contract price. The disappointed bidder argued that the government knew that the winning bidder's proposal was defective and that the government therefore acted arbitrarily and capriciously. The court found that "[t]here may have been some lack of care but certainly the negligence was not gross nor was the decision irrational or totally lacking in reason. That being so, Keco has no meritorious claim." *Keco (II)*, 492 F.2d at 1206, 203 Ct.Cl. at 579. The court in *Keco (II)* further stated:

> The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid, when that omission amounts to simple negligence, is not a sufficient showing of arbitrary or capricious conduct to warrant recovery of bid preparation expenses. The Government's duty to exercise care in evaluating the 'price and other factors' of a bid runs first to the proponent of that bid and to the public and its representatives, and only then to another bid-

der. The responsibility to the latter is too attenuated to justify assessing damages for simple negligence, especially in light of the broad discretion of procurement officials in that aspect of the bid process. Moreover, litigation which second-guesses bid determinations, through efforts to show ordinary lack of due care in appraising competing proposals, should not be encouraged where the award was rational and made in good faith. The interference from such suits, and their impact upon contracting activities, would exact too great a price in the procurement process.

*Keco (II)*, 492 F.2d at 1206–07, 203 Ct.Cl. at 579; *accord, Vulcan Engineering Co. v. United States*, 16 Cl.Ct. 84, 91 (1988); *Kinetic Structures Corp. v. United States*, 6 Cl.Ct. 387, 398 (1984).

c. *The Government Was Correct to Maintain its Evaluation Scheme*

■ Plaintiff also asserts that it is entitled to bid preparation costs because the government's evaluation scheme gave greater weight to technical factors than plaintiff claims was reasonably consistent with the solicitation. Plaintiff maintains that this scheme overly minimized the potential impact of price on the evaluation and selection. Plaintiff cites to a decision of the Comptroller General of the United States, *Coastal Sciences and Engineering, Inc.*, GAO Comp.Gen.Dec. B–236041 (November 7, 1989), to support its point of view. *Coastal Sciences* involved a fixed price contract to conduct a study for the National Park Service. The solicitation at issue in that case indicated that technical considerations were more important than cost. The contracting officer in *Coastal Sciences* applied a formula which gave ninety percent weight to technical and ten percent to price, thus making a small technical advantage determinative. The contracting officer in *Coastal Sciences* did not give credit to the unsuccessful offeror for having small business status. Therefore, in *Coastal Sciences and Engineering*, the General Accounting Office (GAO) concluded that the cost/technical tradeoff, as utilized to give the technical considerations

nine times more weight than cost considerations, was unjustified and inconsistent with stated criteria because the solicitation had merely stated that technical aspects were more important than price, but had not specified the magnitude of the disproportion between the weights assigned to the two criteria.

The facts of the present case, however, are clearly distinguishable from those of *Coastal Sciences*. This case involves a cost-plus-fixed-fee contract, in which the government pays all allowable and allocable fees pursuant to the contract. The government was justified in using a point score favoring technical considerations. Furthermore, unlike in *Coastal Sciences*, the point scheme in the instant case was accurately conveyed in the solicitation, which notified the bidders that technical factors weighed more heavily than cost and management factors, and actually assigned numerical weight to each category. Also, the plaintiff in the present case has not set forth convincing evidence that there was a failure to give the plaintiff credit for factors such as small business status.

Plaintiff also contends, that in the interests of fairness, the government should have considered changing its evaluation scheme during the solicitation process, suggesting that there was a point in the evaluation process when price differentials between offerors become large enough to limit the contracting officer's broad discretion so that more weight should have been given to price when awarding a contract. Defendant argued, in response, that to change the evaluation scheme mid-stream, in fact, would have resulted in the denial of fair and honest consideration of the proposals of those other parties which had responded to the solicitation and based their proposals on the original evaluation scheme. We agree with the defendant that changing evaluation schemes midway through the solicitation process should be avoided and, in fact, could easily lead to prejudice to all the parties who have responded to a solicitation.

### d. *Plaintiff Presented Insufficient Evidence to Prove that Nations Was Pre-selected as the Successful Bidder, Prior to Completion of the Selection Process*

Plaintiff asserts that two documents, a publication entitled "The Voice of SINCGARS" dated April, 1985, and a "Material Fielding Subplan" dated January 14, 1985, suggest that the government improperly had decided that Nations would receive the contract, prior to the conclusion of the appropriate selection process. Plaintiff argues that although both documents are dated prior to the issuance of Solicitation K–040, on May 29, 1985, and award of the contract under that solicitation, both suggest that Nations would do the work to be awarded under Solicitation K–040.

"The Voice of SINCGARS" Issuance, released in April, 1985, states that Nations will accomplish the actual equipment installation and handoff. The defendant argues that a separate organization, in a different chain of command, probably the office of the program manager for SINCGARS, not the office of the contracting officer, published this article. Although the date is listed as April, 1985, the defendant asserts that the article was written prior to the decision to issue a competitive solicitation for the work to be done under Solicitation K–040, and certainly prior to the program manager's office being informed of the decision of procurement officials to competitively compete the follow-on contract to K–029. The defendant argues that the people writing the article based their statements on an old Nations sub-plan under K–029 to continue the work, which assumed that the arrangement with Nations would continue under the option to that earlier contract. When the defendant decided to competitively bid the option period, and not to extend the K–029 contract, the Voice of SINCGARS issuance became obsolete.

The Material Fielding Subplan, dated January 14, 1985, states that: "Nations, Incorporated, a private firm will actually execute the fielding to 'TRADOC' with a team currently foreseen as made up of a project leader and two or three 4–man Ma-

terial Fielding Teams (MFT)." Defendant argues that this document also was printed prior to the date of the decision not to exercise the option with Nations under contract K–029 for the follow-up work, and to go competitive and issue Solicitation K–040.

The court finds reasonable and credible the defendant's explanations, as presented through the documentary evidence and trial testimony, that both the statements in the Voice of SINCGARS and the Material Fielding Subplan were in draft prior to the decision not to exercise the option with Nations under the K–029 contract, and prior to the decision to compete the fielding work through the issuance of Solicitation K–040. Both statements were clearly published prior to the issuance of Solicitation K–040 on May 29, 1985. Moreover, the plaintiff has not offered into evidence any documentation to refute defendant's position or any evidence that responsible procurement officials in any way participated in preparing the two documents offered by plaintiff. In short, the plaintiff has not offered any clear evidence of any pre-selection of Nations. The court, therefore, finds that the limited evidence produced by the plaintiff is insufficient to show that the government wrongfully decided to give Nations the contract under the K–040 Solicitation, without giving JDC's bid just consideration, or that Nations had been preselected after the decision was made by responsible contracting officials to compete the fielding portion of work and not to exercise the option under the earlier contract with Nations, K–029.

## CONCLUSION

The court has examined all the documents entered into the record during the trial. In addition, the court had an opportunity to observe the witnesses during trial and has carefully read the transcript of those proceedings. Based on this review, the court concludes that the record in this case demonstrates that plaintiff has failed to carry its burden of proof to show by clear and convincing evidence that the government's award of the SINCGARS fielding contract to Nations, Inc., rather than to plaintiff, Joseph DeClerk and Asso-

ciates, Inc., was arbitrary and capricious, or in any way improper. Plaintiff had ample opportunity to present evidence in support of its claims of impropriety during its direct case, but failed to do so. The court finds that no conduct on the part of the government has been shown to demonstrate that the contracting process pursuant to Solicitation K–040 was subverted in any way, so as to result in an unfair award of the contract or an unfair denial of that contract to the plaintiff. Therefore, for the reasons discussed above, defendant's Motion to Dismiss is, hereby, GRANTED.

IT IS SO ORDERED.