IOWANS FOR WOI–TV, INC., an Iowa
Corporation; Neil E. Harl; Paul O.
Bracklesberg; Harold R. Crawford;
Dawn Ellis; Douglas Pooch; and Doug-
las N. Yarger, Appellees,

v.

IOWA STATE BOARD OF
REGENTS, Appellant,

Iowa State University Equities
Corporation, Intervenor–
Appellant.

No. 92–1754.

Supreme Court of Iowa.

Nov. 24, 1993.

Rehearing Denied, Dec. 22, 1993.

Bonnie J. Campbell, Atty. Gen., and John M. Parmeter, Sp. Asst. Atty. Gen., for appellant Iowa State Bd. of Regents.

H. Richard Smith and Wade R. Hauser III of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellant Iowa State University Equities Corp.

Lex Hawkins, Glenn L. Norris, George F. Davison, Jr., and Carla T. Schemmel of Hawkins & Norris, Des Moines, for appellees.

CARTER, Justice.

This is a proceeding challenging administrative agency action pursuant to Iowa Code section 17A.19 (1991). The district court considered challenges lodged to the action of the Iowa State Board of Regents (board of regents) authorizing the sale of a commercial television station under the control of Iowa State University, a board of regents institution. The petitioners challenging that sale include staff and faculty of Iowa State University whose educational programs are directly affected by the university's operation of the television facility. The petitioners also include alumni and other interested persons who believe that the sale of the television facility will diminish the educational mission of the university, and a nonprofit corporation organized for purposes of group action in challenging the attempted sale of WOI–TV.

The district court rejected petitioners' contention that the board of regents lacked authority to approve the sale of WOI–TV but found that the sale the board approved to a nonresident media group was fatally flawed on procedural grounds. One of these flaws, the court believed, was that, under the corporate structure for ownership of the station established in 1987, the board of regents' role in the disputed transaction was limited to approving or disapproving action initiated by the ownership corporations or Iowa State University. Based on these conclusions, the district court annulled the action of the board of regents approving the challenged sale of WOI–TV to an affiliate of Citadel Communications Company of Bronxville, New York (Citadel).

The appellants are the board of regents and the intervenor, Iowa State University Equities Corporation, a nonprofit holding company owned by Iowa State University whose subsidiary, Iowa State University Broadcasting Company, operates WOI–TV for the benefit of Iowa State University. The appellants argue that the district court was correct in upholding the board of regents' authority to sell the university-controlled television facility. They contend that the court erred, however, in concluding that the sale of WOI–TV to Citadel's affiliate, approved in principle at the board's May

1992 meeting and thereafter reduced to a written contract of sale, should be annulled because of procedural defects in the sale process. After considering the arguments presented and reviewing the record and applicable legal authorities, we reverse the judgment of the district court.

Iowa State University acquired the first licensed television station located in this state. It went on the air in February of 1950 as WOI–TV. The station was a project of Charles Friley, the then president of the university. The funding came from revenues received by the university from the Department of Defense for metallurgical synthesis performed at the university as part of the Manhattan Project during World War II.

WOI–TV became affiliated with the American Broadcasting Company Network. It is engaged in a broadcast schedule not dissimilar from privately owned commercial television stations. Prior to 1987, the station operated on a break-even basis providing substantial in-kind educational services to the university but no revenues for other university programs.[1] After 1987, an effort was made to increase revenues from the station, and that effort produced some funds that could be applied on other educational projects.

In the early 1970s, a substantial offer was submitted to the board of regents by an entity interested in purchasing the station. The idea of selling WOI–TV was considered by the university at that time and rejected. A citizens select committee for the study of state government appointed by Governor Ray in 1978 recommended that the station be sold and that the proceeds be used to fund other educational projects at Iowa State University. The board of regents, at the urging of then Iowa State University president W. Robert Parks, elected not to take that action.

In 1985, the board of regents requested Iowa State University to conduct a study to determine the potential benefits as well as harmful effects that would result if WOI–TV were sold. That study was to include a plan to be followed in the event of a decision to sell. A seven-member study committee was appointed by the university president in 1986. It consisted of three nonuniversity representatives from the professional and business community, the university's vice president of finance, the university's director of information, and other staff and faculty members.

The study committee prepared a report that was presented to the board of regents at its December 1986 meeting. It concluded that continued retention of the television facility could only be justified if its financial performance were substantially improved. Significant management changes were recommended, and the report advised that the ultimate status of the station should be determined over a three-year period with annual reviews to be presented to the board of regents.

As a partial response to the study committee's recommendations, the board of regents, at its March 1987 meeting, approved the formation of Iowa State University Broadcasting Corporation to manage and operate WOI–TV as a commercial venture. It further directed that Iowa State University should organize another corporation known as Iowa State University Equities Corporation to serve as a holding company for all of the stock of the operating corporation. The university would be the sole member of the nonprofit corporation formed as a holding company. The minutes of the board meeting at which the creation of these corporations was discussed indicate that the board of regents was to hold ultimate control over these corporations. That was accomplished by requiring board approval for appointment of directors of the holding company that held control over the operating corporation. In addition, the board retained the right to remove all of the directors of the holding company without cause.

Leases of studio facilities to Iowa State University Broadcasting Corporation by the university were approved and transmission towers, operating equipment, necessary li-

---

1. These in-kind educational services included student internships and the use of the facility for journalism, mass communications, meteorology, and extended learning programs. In addition, the WOI radio transmitter is located on the television tower.

censes, network affiliation contracts, and programming agreements were transferred to the operating corporation. The transfer methodology was designed, in part, to minimize the tax obligations that would flow from operating the television facility by taking full advantage of net operating losses transferred to the broadcasting corporation by Iowa State University.

The board of regents directed that annual reports be made to that body concerning the feasibility of retaining WOI–TV by both the study committee, which remained intact, and the general manager of the operating corporation. The first such report was made in November of 1988. The second report was made in December of 1989. The third report due in late 1990 was deferred until September 1991 because a change had occurred in the presidency of the university.

The September 1991 report of the university's study committee advised the regents that, although WOI–TV continued to provide educational benefits to the university and had improved its cash flow and profitability, it could not efficiently serve the market from the Ames location. In order to improve the financial performance of the station, a significant capital investment would be required to move the station's location to Des Moines. The report concluded that a sale of the station was justified if an adequate price could be obtained within the range outlined by a consultant qualified to appraise the value of WOI–TV. It was further recommended that the university retain the proceeds from the sale and use it to mitigate the sale's impact on academic programs. The president of the university submitted this report to the board without expressing disagreement.

The board acted at the September 1991 meeting to initiate a sale of WOI–TV through the efforts of a commission broker. The broker was to informally solicit bids after an investigation to identify potential buyers. Although in form these bids were solicited through Iowa State University Equities Corporation, all contacts were made by the broker and controlled by the distribution of bidding packages. The broker contacted sixty potential buyers, and its efforts produced six bids. Citadel was one of these bidders; however, the university concluded that the best of these bids was that of Iowa Television Group, Inc. That corporation had bid $14 million, of which $4 million was cash at closing, with the balance to be paid over ten years. A professional appraisal of WOI–TV indicated that its value as of January 1992 was $12.3 million.

At the February 1992 meeting of the board, the university president recommended that the Iowa Television Group, Inc. bid be accepted. One of the board members challenged the analysis that had been made of the collateral being offered to secure the leveraged portion of that bid. Partly in response to that concern, action on any of the bids was deferred, and an investment banker was retained to further analyze the bids. Ultimately, none of the six bids considered at the February 1992 meeting were accepted.

Written procedures were developed to secure additional bids. Relevant provisions that were contained in the bidding protocols developed for that purpose include the following:

### ARTICLE III

### EVALUATION OF PROPOSALS

3.1 *Financial Analysis.* All proposals submitted in accordance with the terms and conditions set forth herein will be submitted to Iowa State University Equities Corporation for analysis by its employees and/or agents, and to Duff & Phelps Financial Consulting Co., financial consultants to the Iowa State Board of Regents, for its analysis. Duff & Phelps will independently determine which proposal reflects the highest value; will ascertain the financial fairness of the highest proposal received; and will offer an opinion as to the adequacy of the collateral provided for and the overall security of any promissory note included as part of a proposal.

. . . .

3.3 *Consultation with Proposers.* Following an initial analysis of the proposals received, ISUBC and the advisers to and counsel for the Iowa State Board of Regents will schedule meetings, which may

be held by telephone conference call, with all of those making timely proposals. These meetings will not be held for the purpose of negotiating new proposals. These meetings will be held for the purpose of clarifying any questions concerning the proposals and to ensure that ISUBC and the advisers to and counsel for the Iowa State Board of Regents have a clear understanding of the exact terms and conditions of the written proposals. Therefore, proposers are strongly encouraged to make their best and most complete proposal in accordance with the terms and conditions of Article I herein.

## ARTICLE IV

### PROPOSED SCHEDULE SUBSEQUENT TO PROPOSAL SUBMISSION

4.1 *Letter of Intent.* Following the meetings with all proposers described in 3.3, ISUBC and advisers to and counsel for the Iowa State Board of Regents will proceed to meet with the submitter of the proposal deemed to be most advantageous to agree on the terms and conditions of a Letter of Intent which the proposer is prepared to execute and which ISUBC and advisers for and counsel to the Iowa State Board of Regents is prepared to recommend to the Board for its approval. It is anticipated that this Letter of Intent be submitted to the Board at its meeting to be held May 20, 1992, although ISUBC reserves the right to take additional time if necessary. However, should there be two or more proposals that are indistinguishable, ISUBC reserves in its sole discretion the right to negotiate further with the proposers or to present all indistinguishable proposals to the Iowa State Board of Regents for its determination.

. . . .

## ARTICLE V

### IOWA STATE BOARD OF REGENTS

5.1 *Authority of Board.* Nothing in this or any other document shall require the Iowa State Board of Regents to approve the sale of WOI–TV. The Board may, in its sole discretion, reject any and all proposals received or may require further negotiation of proposals received.

These protocols were developed by Iowa State University Equities Corporation in consultation with counsel for the board of regents and the investment banker retained by the board. The protocols stated that the proposals were being solicited by Iowa State University Broadcasting Corporation. The protocols provided that all bids were to be received by April 10, and the May meeting of the board was designated as a forum to hear public comments on the proposed sale.

Four bids were received as a result of the new bidding protocols. Iowa Television Group, Inc. did not present a bid. Citadel did present a new bid. The investment banker retained by the board was highly critical of all four bids submitted because the collateral proposed for financing the purchase over time was determined to be below investment grade quality.

On May 11, the president of the university made a public statement indicating the dissatisfaction with the bids and suggested that, because the two rounds of bidding had not produced a satisfactory offer, plans to sell the television station be discontinued.

Shortly after the president's public statements, a representative of Citadel attempted to contact President Jischke or Vice President of Finance Madden to learn if further negotiation of Citadel's bid would be permitted. Vice President Madden advised the Citadel representative that the matter would have to be taken up with the board of regents. Mr. Lombardo, Citadel's representative, then telephoned regent president Pomerantz and discussed further negotiation of Citadel's bid. President Pomerantz suggested it might take an all-cash offer to be successful. Mr. Lombardo was told to place any additional offer in writing and submit it to the board of regents.

On May 14, Citadel sent a letter to the board offering the equivalent of $14 million cash. In addition, WOI–FM radio would be provided continued access to the television tower, and the buyer would pay cash rent for the Ames studio over a four-year period. On

Friday, May 15, and Monday, May 18, the board of regents staff faxed copies of the newest Citadel proposal to the other entities participating in the second round of bidding and also to Iowa Television Group, Inc. Each bidder was told that, at the board's May 20 meeting, President Jischke's recommendation to reject all previous bids would be considered as would Citadel's revised bid.

Some of the petitioners appeared at the May 20 meeting of the board and objected to the sale on the grounds of educational policy. At this time, President Jischke also spoke against the proposed sale and recommended that the television facility be retained. At this meeting, the board considered, in the alternative, the sufficiency of the four bids received in response to the protocol and, what its response should be, if any, to Citadel's revised bid. The board voted to reject all of the four bids received in response to the protocol. The board then voted to conditionally accept the new terms offered by Citadel subject to the negotiation of a definitive agreement.

At the June 1992 meeting of the board, some of the petitioners again appeared and objected to the sale. The board voted to affirm and ratify its May actions. Thereafter, negotiations of an asset purchase agreement with Citadel were completed. Representatives of Iowa State University and Iowa State University Broadcasting Corporation participated in those efforts along with counsel for the board of regents and the investment bankers retained by the board.

On September 2, 1992, Iowa State University Broadcasting Corporation approved a resolution in favor of the sale and forwarded it to its sole shareholder, Iowa State University Equities Corporation, for consideration. Iowa State University Equities Corporation unanimously approved the transaction by action of its board of directors on September 10, 1992. At the board of regents meeting of September 23, 1992, the board approved the sale of the television facility pursuant to the terms of the written contract of sale. That agreement is between Iowa State University Broadcasting Corporation, the board of regents, and Iowa State University collectively, as sellers, and Citadel's affiliate, Capital Communications Company, as buyer. It has been executed by all parties.

On June 24, 1992, the petitioners sought injunctive and mandamus relief in the district court for purposes of blocking the sale of WOI–TV to Citadel's affiliate. Ultimately, this action was converted into a proceeding for review of administrative agency action under Iowa Code section 17A.19. The petitioners asserted that the board of regents lacked authority to dispose of a valuable state asset absent legislative approval. They emphasized the fact that in May of 1992 both houses of the General Assembly approved legislation blocking the proposed sale. Although that legislation was ultimately vetoed by the Governor, petitioners assert that the legislative resolution should be accorded the same force of law in blocking the proposed sale as it would be accorded in blocking agency rule making pursuant to Article III, Section 40 of the Iowa Constitution.

In addition, petitioners urged that the board of regents' actions violated the protocols that the board itself had established for carrying out the sale. Those protocols, petitioners assert, were binding on all parties to the transaction, including the board. Additional assertions by petitioners included the contention that, as a result of the corporation structure for ownership of WOI–TV after 1987, the board's authority in the proposed disposition of the television facility was only to approve or disapprove of action initiated by the affected corporations or Iowa State University. Petitioners asserted that this authority was exceeded when the board itself initiated the transaction with Citadel.

## I. *Standard of Review.*

The parties agree that the administrative decisions being reviewed fall under that broad residual category of administrative agency determinations that are characterized as "other agency action." Consequently, the district court considered petitioners' complaints on the basis of whether their substantial rights had been prejudiced because the action in question was in violation of constitutional or statutory authority, in violation of agency rules, made by unlawful procedure, or unreasonable, arbitrary, or

capricious. Those are the statutory grounds for challenging administrative action in situations not involving contested case hearings. *See* Iowa Code § 17A.19(8)(a), (b), (c), (d), (g) (1991); *see generally Sindlinger v. Iowa State Bd. of Regents*, 503 N.W.2d 387, 390 (Iowa 1993). We review the challenged action under the same statutory mandate.

## II. *Authority of Board of Regents to Complete a Sale of WOI–TV.*

The district court held that the board of regents was empowered to sell state assets under its control by virtue of the broad administrative authority granted to it under Iowa Code chapter 262. Although the petitioners strongly dispute that contention, we believe that the court was correct on this issue.

The board of regents is authorized by statute to "[m]anage and control the property, both real and personal, belonging to the [regents'] institutions." Iowa Code § 262.9(4) (1991). That the board may dispose of assets of the institutions under its control is contemplated by Iowa Code section 262.11, which requires a recorded roll call vote of the members of the board on action to dispose of lands and other property of the institutions under the board's control. Although it is provided that the board must secure approval of the Executive Council as to the sale of real property, a similar restriction is not found concerning the sale of other types of assets.[2]

In addition to the statutes granting authority to manage and control the property of the institutions under its jurisdiction, the board is granted the power to "[p]erform all other acts necessary and proper for the execution of the powers and duties conferred by law upon it." Iowa Code § 262.9(12) (1991). In determining the scope of this broad general grant of authority, there are practical reasons for sustaining the board's authority to complete the transaction challenged in the

present litigation. The record is clear that all of the critical aspects of the decision to sell WOI–TV were considered in the context of Iowa State University's educational mission as a land grant institution. Within this context, the board determined that the favorable impact that the cash proceeds from this sale will have on the university's land grant mission outweigh any benefits from continuing to retain the television station.

Although reasonable minds might differ concerning the validity of the board's determination, it may not be disputed that this was the type of long-term educational planning decision that the board was empowered to make. Obviously, if the authority of an administrative agency to formulate a policy does not carry with it the power to implement that policy, the agency is handicapped in its ability to fulfill its function. For that reason, we have recognized that the authority of agencies with broad policy-making functions is broad and plenary in the absence of statutory limitations. *See Porter v. Iowa State Highway Comm'n*, 241 Iowa 1208, 1216, 44 N.W.2d 682, 687 (1950).

We are not suggesting that the legislature may not place specific controls on the actions of those administrative bodies that it creates. We are only stating that, at the time of the challenged transaction, there was no statutory restriction limiting the board's authority to act in the manner it did. The Governor's veto of the 1992 enactments by the General Assembly was, in effect, a rejection, within the established political process, of the restriction contained in the vetoed bill. Moreover, the vetoed enactment did not serve to annul the challenged action of the board based on the restrictions placed on administrative agency rule making by Article III, Section 40 of the Iowa Constitution. The limitation on rule making is not relevant here because the board was not required to enact a rule to deal with a nonrecurring policy decision within its general authority.[3]

2. Prior to 1971, Executive Council approval was also required with respect to the disposal of personal property by state agencies, but that provision was repealed by 1971 Iowa Acts § 84.99.

3. Petitioners have also asserted throughout these proceedings that the board of regents' power to

divest the university of this television facility was curtailed by certain language that the General Assembly placed in a 1985 appropriations bill (1985 Iowa Acts ch. 263, § 12). The district court concluded that any proscriptive force attributable to this enactment was limited to the

III. *Limitations Placed on the Board's Authority by the Corporate Structure of WOI–TV's Ownership.*

Having agreed with the district court's conclusions that the challenged transaction was generally within the board's authority to act, we must disagree with its additional conclusion that such authority had been reduced by the board itself in approving the corporate structure for ownership of WOI–TV in 1987. In analyzing this question, we accept petitioners' argument that, having created this corporate structure, the board is bound by all of the legal consequences necessarily resulting therefrom.

■ The Articles of Incorporation for Iowa State University Equities Corporation provide that that corporation cannot approve a sale of assets by the broadcasting corporation, other than in the ordinary course of business, without the consent of Iowa State University and approval of the board of regents. The district court concluded that the legal effect of this provision was to preclude the board from initiating any transaction for a sale of the broadcasting corporation's assets. We disagree. The fact that the board of regents may not have been able to complete the proposed transaction without first securing some required action by other entities did not defeat the board's authority to initiate the transaction. And, because the other entities required to take action in completing the sale did act in the required manner, we need not be concerned with what the result would have been had they not done so.

■ The limitation on the power of the holding company to act in certain transactions without board of regents' approval may not be interpreted as diminishing the authority of the board to act within its own full range of authority. The board's right of approval, by its very nature, placed it in the dominant position with respect to any transaction for which such approval was required. That dominancy was amplified by the control that the board exercised over the board of directors of the holding company. It is not unusual or irregular for an entity that enjoys such a dominant position in a proposed transaction to assume control at some stage of the proceeding. When and where that happens will vary depending upon the nature of the transaction. Here it occurred after the first round of bid solicitation, which had been initiated by Iowa State University and the affected corporations, proved fruitless and the second round of bidding also appeared to have been of no avail. At this point, a cash bid for more than the appraised value of the television station probably seemed too good to be true. That bid offered the board an opportunity to achieve its intended goal if it took prompt action on its own initiative. Under the circumstances with which it was presented, we cannot conclude that the board's action was arbitrary or capricious or otherwise unlawful.

We also disagree with the district court's finding that the transaction was invalid because Iowa State University did not consent to the sale of WOI–TV to Citadel's affiliate. In so holding, the district court found that the significant expression of the university's position on this matter was the statement in opposition to the sale made by President Jischke at the May 1992 meeting of the board.

Although the district court acknowledged that President Jischke ultimately acquiesced to the completion of the transaction by seeking approval from the corporate boards of directors of the holding company and the operating corporation and by providing his signature on behalf of Iowa State University on the contract documents, the court believed that those actions were the result of coercion.

■■ The record reflects that the comments of President Jischke at the May 1992 meeting, which were antagonistic to the proposed sale, occurred before the vote of the board. After the board voted to conditionally accept the Citadel offer, the president's official position was to cooperate in completing that transaction. There is no way to ascertain with certainty what the president's personal beliefs were on this matter, but that

fiscal year for which the appropriation was made. We need not decide if that conclusion was correct. Under our interpretation of the

language on which petitioners rely, this legislation never had any proscriptive force with respect to the action now being challenged.

is not controlling. It was his official actions following the vote of the board that constituted the voice of Iowa State University in completing the proposed sale. As a general proposition, a public institution speaks through the formal action taken by the person or board empowered to take that action. *Stillians v. Iowa State Arts Council*, 410 N.W.2d 253, 254 (Iowa 1987). The president was solely empowered to speak for the university on this policy issue. The university's consent to the sale was officially memorialized by President Jischke's signature on the contract documents.

With respect to the district court's conclusion that President Jischke was coerced, we believe that the coercion the court perceived flowed entirely from the realities of the institutional setting in which President Jischke found himself. He stood in a subordinate position to the board on this policy matter. Although he perhaps had the power to block the proposed sale, the board had the power to decide who would be president of Iowa State University. The type of coercion which that relationship produces is a fact of life and does not serve to invalidate an election to accede to the will of a superior authority.

### IV. *Whether the Board Acted Illegally or Capriciously by Violating the Bidding Protocols.*

As a final matter, we consider the board's challenge to the district court's conclusion that it acted illegally or arbitrarily and capriciously by violating the bidding protocols. Specifically, the district court found that such a violation occurred when the board negotiated with only one of the unsuccessful bidders rather than reopening the bidding to all bidders under a new protocol. The district court's conclusions were predicated on the language of the motion that the board passed in rejecting the four initial bids submitted prior to its May meeting. That motion purports to reject all bids, including Citadel's initial bid. This motion was followed by another motion conditionally accepting Citadel's subsequent $14 million cash bid.

Although the form of the board's motions can be interpreted as action on a new bid that was independent of Citadel's previous bid and thus outside the bidding protocol, we believe that such an interpretation would exalt form over substance. In Article V of the bidding protocols, the board reserved the right to continue negotiations with any of the bidders after the initial bids were submitted. We believe that action by the board or its president to advise Citadel to submit any new offer in writing and to consider that offer at the meeting that had been scheduled to review all bids was a form of further negotiation with respect to Citadel's bid.

In conclusion, we note that petitioners, in an effort to sustain the judgment of the district court, have lodged several arguments that suggest that the sale of WOI–TV is not in the best interests of Iowa State University or the State of Iowa. We do not address these conclusions because we have determined that the board of regents possessed the ultimate authority to pass on that issue of long-range educational policy and to implement that policy by acting to sell WOI–TV. Although petitioners' arguments on the merits of the board's policy decision are not without substance, they do not provide a ground for overturning the policy choice of an administrative agency within its scope of authority.

After due consideration of the issues presented, we conclude that the judgment of the district court must be reversed.

**REVERSED.**