MEDCO BEHAVIORAL CARE
CORPORATION OF IOWA,
Appellee,

v.

STATE of Iowa DEPARTMENT OF
HUMAN SERVICES, Appellee,

Value Behavioral Health, Inc.,
Intervenor–Appellant.

VALUE BEHAVIORAL HEALTH,
INC., Appellant,

v.

STATE of Iowa DEPARTMENT OF
HUMAN SERVICES, Appellee,

Medco Behavioral Care Corporation
of Iowa, Intervenor.

No. 94–1875.

Supreme Court of Iowa.

July 24, 1996.

W. Don Brittin, Jr. and John F. Lorentzen of Nyemaster, Goode, McLaughlin, Voigts, West, Hansell & O'Brien, P.C., Des Moines, for appellant Value Behavioral Health, Inc.

Brent R. Appel of Dickinson, Mackaman, Tyler & Hagen, P.C., Des Moines, and James W. Carney of Carney, Williams, Blackburn, Grask & Appleby, Des Moines, for appellee Medco Behavioral Care Corporation of Iowa.

Thomas J. Miller, Attorney General, and Richard E. Ramsay, Assistant Attorney General, for appellee State of Iowa Department of Human Services.

Considered by HARRIS, P.J., and LARSON, LAVORATO, NEUMAN, and TERNUS, JJ.

HARRIS, Justice.

I. *Overview.*

The Iowa department of human services (DHS) awarded a valuable contract ($200 million) to provide managed mental health care to Iowa's Medicaid program to Value Behavioral Health, Inc. (Value). The award was challenged through the administrative process and on judicial review by Medco Behavioral Care Corporation of Iowa (Medco). On judicial review, as permitted by Iowa Code section 17A.19(7) (1991), the district court heard additional evidence to expand and explain the record.

The additional record revealed matters the court considered an organizational conflict of interest on the part of Value. The court found, under applicable federal law, that the conflict was so serious as to disqualify Value from the bidding process. The court therefore remanded the matter back to the agency for further proceedings consistent with that determination.

On remand the agency complied with the court's order disqualifying Value, and then awarded the contract to Medco. Although numerous challenges are at issue in this appeal—from an order following a second judicial review—we think the core one is whether the court was correct in finding disqualification as a matter of law. Such questions are routinely answered by an agency, and only reviewed by a court which, while doing so, accords due deference to agency action. We nevertheless think, because of the unique facts and the question's strange and convoluted posture, the district court acted appropriately. Therefore, after rejecting the other challenges to the district court's various holdings, we affirm.

II. *Factual background.*

Due to the rising cost of health care in recent years, Medicaid has consumed an ever increasing portion of the state budget. This development presented DHS with a perplexing dilemma: how to contain spiraling health care costs while ensuring quality care. In accordance with the advice of many experts, DHS concluded managed care was the most viable solution, and it explored this alterna-

tive on a small scale—individual county— basis through negotiated contracts.

On the basis of this experience, DHS became satisfied with this approach and in January 1993 it sought a contractor to perform the following tasks: to maintain existing Medicaid managed health care systems (which did not include mental health care services) and expand these systems to additional counties; to assess the feasibility of alternative managed health care systems or other forms of cost containment and implement those systems as appropriate; and to conduct policy analysis concerning the expansion of Medicaid managed care. The contract was awarded to the Unisys Corporation (formerly known as Paramax Systems Corporation) in April 1993. Unisys immediately subcontracted some of its duties under the contract, particularly policy analysis regarding the implementation of a managed program for the *mental* health care of Medicaid recipients, to Lewin–VHI (Lewin). Lewin is a subsidiary of Value Health, Inc. This relationship is at the heart of the present controversy.

Lewin proceeded with the policy analysis, and by November 1993 DHS determined it desirable to contract with a private company to provide managed *mental* health care for Iowa Medicaid recipients. A decision was made to utilize a competitive bidding process to award the contract.[1] This procurement process requires the preparation of a document referred to as a "request for proposals" (RFP). As the name suggests, a RFP details the services and duties to be performed under the contract, describes the criteria for evaluating proposals, and solicits proposals from qualified bidders.

Conflict of interest questions arose regarding Lewin's participation in the policy analysis pertaining to the RFP because Value [Behavioral Health, Inc.], another subsidiary of Value Health, Inc., was interested in bidding on the contract. Furthermore Unisys expressed a potential desire to bid in partnership with Lewin or Value. Because of this potential conflict, Lewin did not prepare the RFP, but it did work on other items of the policy analysis for the implementation of the program—including the capitation rates (the per person rate to be paid for managed care services). At that time Lewin also voluntarily imposed an "embargo" on communications with Value with regard to all Iowa matters, and later instituted a similar embargo with Unisys.

On the recommendation of Lewin, Health Management Associates (HMA) prepared the RFP for the managed mental health care contract. Unbeknownst to DHS, Lewin had business relationships with HMA in other states including Connecticut and Montana regarding health care programs.[2] HMA's final draft of the RFP strongly favored the technical criteria of the bids over the cost criteria. The bids were required to be within a range of eighty-six to eighty-eight percent of the projected cost for an unmanaged health care system. This narrow two-percent range effectively eliminated the role of price in the bidding process. Rather the RFP required a proposal to meet a 340 point threshold score—out of a possible 400 points—regarding technical criteria before a vendor's bid could receive further consideration (*i.e.*, before its cost bid would be reviewed). The requirements apparently were developed because of the department's desire for quality care in a managed system and the belief that any bid below the eighty-six percent floor necessarily sacrificed quality for cost savings. In the opinion of one expert, this de-empha-

1. In 1993 a private vendor (CMG Health), represented by a former gubernatorial aide, proposed to DHS that it (the private vendor) provide managed mental health services without competitive bidding. Because of concerns about the appearance of impropriety, the General Assembly enacted the following provision:

The department of human services shall select a contractor for a prepaid mental health services plan for medical assistance patients ... solely on the basis of the bid documents submitted by respondents. The department shall not apply a preference to a respondent for a previous proposal submitted to the department or for an endorsement of a respondent by another person or potential provider of services under the plan.

1994 Iowa Acts ch. 1199, § 39. This enactment signifies a legislative concern for the appearance of fairness when awarding the contract.

2. We find nothing in the record to suggest this relationship was ever disclosed to DHS.

sis on cost incidentally benefited less experienced vendors of Medicaid managed health care systems in the bidding process (such as Value) over those vendors with more expertise in the area (such as Medco).

After the RFP was issued to the public in March 1994, eight proposals were received. Seven professionals were then selected, based on their various knowledge and expertise in the area of mental health services, to evaluate the eight proposals.

The two bids with the highest technical scores were proposals submitted by Value and Medco. The evaluators determined (a finding later discredited) that only Value's proposal met the 340 point technical threshold for receiving further consideration. The evaluators then examined Value's cost bid, and it fell within the range required by the department. Medco's cost proposal was not opened, but it also met the cost requirements for the bid and was under Value's bid. The evaluators, relying on the finding that only one bidder met the requirements of the RFP, recommended that Value be selected as the contractor.

On June 14, 1994, DHS announced its selection of Value as the successful bidder. Pursuant to the terms of a provision in the RFP, Medco filed an appeal with DHS. Although the initial notice did not specifically allege any conflicts of interest, Medco subsequently filed a request for a hearing and waiver of time requirements seeking production of documents regarding the evaluation of the bids and Lewin's or Unisys' participation in the development of the cost requirements or other provisions involving the RFP. DHS denied this request and entered a final decision denying Medco's appeal. The director determined the procedures for—and scoring of—the proposals were not arbitrary and capricious. The director also found no conflict of interest, believing the information provided by Lewin regarding costs was shared with all potential bidders, and that the information could not have been utilized favorably by any single bidder.

Not satisfied, Medco filed a petition for judicial review generally raising conflict of interest issues and irregularities in the bidding process. Medco also sought a stay of any action to implement the contract, which the district court granted.

Intensive discovery uncovered several unsettling matters. First the evaluators had miscalculated the technical score on Medco's proposal and Medco had indeed also met the threshold for considering its cost bid. Second there were indications that the evaluators had improperly considered information outside of the bidding process. Finally DHS discovered that substantial conflict of interest questions existed regarding the various relationships between Lewin, Value, Unisys, and HMA.

On the basis of this new information, Medco and DHS filed a joint application to adjudicate law points asking the district court to determine whether there was a conflict of interest that required disqualification of Value from receiving the contract. Value subsequently filed a petition for intervention. The district court responded by entering an order overruling the application to adjudicate law points. Value was allowed to intervene and filed an answer to Medco's petition, asserting that, for a number of jurisdictional and procedural reasons, Medco was barred from proceeding.

At a hearing on the matter, over objections by DHS and Value, the court received evidence regarding Value's alleged organizational conflicts of interest and irregularities in the bidding process, reasoning the additional evidence highlighted and explained the agency's decision. In light of Value's intervention, the court also granted Medco leave to amend its petition for judicial review for further specification of the issues concerning the conflicts of interest, procedural irregularities, and the impropriety in minimizing cost as a factor in the bidding process.

Upon submission the district court, after rejecting Value's preliminary jurisdictional and procedural challenges, reversed the award of the contract to Value. Although the court agreed there was no proof of corruption in the bidding process, and no overt favoritism, it nevertheless concluded Lewin's business relationships with Value, HMA, and Unisys involved an organizational conflict requiring disqualification of Value. The court

concluded this conflict rendered the DHS decision unreasonable, arbitrary and capricious. The court further determined the evaluation process was invalid because the evaluators had miscalculated the technical portion of Medco's proposal and had improperly considered information outside of the bids in violation of Iowa law. The court did however determine the treatment of cost would not be invalid with Value disqualified from participating. The court thus reversed DHS's decision and remanded the case to the agency for further proceedings.

Value appealed, and Medco cross-appealed. DHS however acquiesced in the district court ruling: before the appeals could be heard DHS announced that the award of the contract to Value had been rescinded, and stated its intention to award the contract instead to Medco. Value appealed to DHS challenging this action and requesting DHS to join in Value's appeal of the district court ruling, and to take any action necessary to affirm the initial award of the contract to Value. DHS denied Value's appeal on the ground that Value had no legal standing to protest the award to Medco because it had been disqualified from the bidding process by the district court ruling.

Value filed a petition for judicial review challenging DHS's ruling, and requested a stay of DHS's award of the contract to Medco pending Value's appeal of the first district court ruling. The application for stay was denied. DHS then filed a motion to dismiss the judicial review action as moot because it had already entered into a contract with Medco.

After a hearing, the district court entered a second ruling affirming DHS's decision to award the contract to Medco. The court also overruled the motion to dismiss on mootness grounds. Again Value appealed, and DHS cross-appealed. We then ordered consolidation of Value's two appeals.

■ Our review is on error. Iowa R.App.P. 4. The parties sought judicial review in district court of a final agency action under the power conferred by the Iowa administrative procedure Act, and the sole question on appeal is whether the district court correctly applied the law. *Foods, Inc. v. Iowa Civil Rights Comm'n*, 318 N.W.2d 162, 165 (Iowa 1982).

III. *Preliminary matters.*

■ We have considered and now reject several preliminary contentions by the parties that the case does not present a justiciable matter and thus must be summarily resolved in favor of one party or another. For the most part we choose not to discuss these contentions,[3] but do wish to point out that Medco did have standing to challenge the bidding process. Generally an unsuccessful bidder lacks standing to do so without some specific grant of authority. *Elview Constr. Co. v. North Scott Community Sch. Dist.*, 373 N.W.2d 138, 141 (Iowa 1985).

Medco does however have standing to challenge this process. Standing is derived from Iowa Code chapter 249A. The final decision of DHS awarding the contract (and its disposition of any resulting appeals) falls within the broad residual category of administrative action known as "other agency action."[4]

---

3. Other preliminary challenges are controlled by well-settled principles and to discuss them would yield nothing of precedential value. A misnomer in Medco's corporate name was not prejudicial and did not deprive it of legal existence. DHS's failure to join Value in the appeal did not deprive us from considering Value's assignments. The case is not moot and we find error was preserved on the matters we shall discuss.

4. The district court reviewed Medco's petition as other agency action, and Medco does not appear to dispute this characterization. Indeed this controversy cannot be said to involve a contested case proceeding. As we explained in *Sindlinger v. State Board of Regents:*

Contested case hearings as envisioned in § 17A.12 are those in which the legal rights, duties, or privileges of a party are required by constitution or statute to be determined by the agency after an opportunity for an evidentiary hearing. Iowa Code § 17A.2(2) (1991). If the agency establishes a less formal hearing procedure than is mandated by § 17A.12 in those situations in which there is no statutory or constitutional entitlement to a contested case hearing, any adjudication that takes place in that procedure is reviewed as "other agency action" and not as a contested case.

503 N.W.2d 387, 389 n. 1 (Iowa 1993). As previously mentioned, this less formal procedure has been established by DHS to process any

Parties who are "aggrieved or adversely affected by agency action" may seek judicial review in district court to determine whether their "substantial rights . . . have been prejudiced" because the action in question was in violation of constitutional or statutory authority, in violation of agency rules, made by unlawful procedure, or was unreasonable, arbitrary, or capricious. *See* Iowa Code §§ 17A.19(1), (8)(a)–(g); *Iowans for WOI-TV, Inc. v. Iowa State Bd. of Regents,* 508 N.W.2d 679, 684–85 (Iowa 1993); *see also* Iowa Code § 17A.20 (any final judgment of the district court is reviewable on appeal). From this language we have formulated a two-prong test for standing under the Iowa administrative procedure Act (IAPA): the complaining party must (1) have a specific, personal, and legal interest in the litigation; and (2) the specific interest must be adversely affected by the agency action in question. *See City of Des Moines v. Public Employment Relations Bd.,* 275 N.W.2d 753, 759 (Iowa 1979).

We think Medco easily satisfies both prongs. As an unsuccessful bidder on the managed mental health care contract, Medco possessed a specific, personal, and legal interest in being awarded the contract that was adversely affected when DHS initially decided to award the contract to Value. *See Iowa Bankers Ass'n v. Iowa Credit Union Dep't,* 335 N.W.2d 439, 444–45 (Iowa 1983) (lost business constitutes an injurious effect to a competitive interest).

## IV. *Discretionary rulings.*

### A. *Receiving additional evidence.*

■ Justiciable issues aside, Value contends the proper scope of our review should be limited because of two challenged discretionary rulings made in connection with the first district court decision. Value first claims the district court improperly received additional evidence and contends we should not consider it on appeal. This additional evidence pertained to errors in calculating Medco's technical bid and the interrelationships between Value, Lewin, Unisys, and HMA. Medco uncovered this evidence

through a discovery order granted by the district court, and therefore it was not part of the administrative record.

■ When reviewing "other agency action" a court may base its judicial determination on consideration of an amplified factual record, not just the information available to the agency. *Lickteig v. Iowa Dep't of Transp.,* 356 N.W.2d 205, 208 (Iowa 1984). This principle is derived from Iowa Code section 17A.19(7) which expressly grants a court sitting in review of agency action (except a court reviewing contested cases) the discretion to receive and consider any additional evidence it deems appropriate. *Community Action Research Group v. Iowa State Commerce Comm'n,* 275 N.W.2d 217, 219 (Iowa 1979). This discretion is for the qualified purpose of "highlighting what actually occurred in the agency in order to facilitate the court's search for errors of law or unreasonable, arbitrary, or capricious action." *Krause v. State ex rel. Iowa Dep't of Human Serv.,* 426 N.W.2d 161, 165 (Iowa 1988). This discretion is accorded in those situations where evidence outside the agency record tends to demonstrate the agency exceeded its legal authority or committed other error. *See Iowa Power & Light Co. v. Iowa State Util. Bd.,* 448 N.W.2d 468, 471 (Iowa 1989). The discretion is not without limits; the additional evidence may not be used as a springboard for the trial of factual issues de novo in district court. *Krause,* 426 N.W.2d at 165.

Our review of the record here satisfies us that all of the additional evidence offered by Medco was properly considered by the district court for the limited purpose of highlighting what actually occurred in the bidding process (*i.e.,* errors in calculating the technical scores and potential conflicts of interest). We reject Value's contention to the contrary.

### B. *Granting Medco leave to amend its petition for judicial review.*

■ Value contends the district court erred in allowing Medco to amend its petition for judicial review, pointing out a lack of express authority in the IAPA for the district

protest of the award of the contract. *See* Iowa Admin.Code r. 441–88.62(1)(c).

court to do so. Value thus argues it would be improper for us to consider allegations not contained in Medco's original petition.

In ordinary civil proceedings a district court may grant a party leave to amend a pleading; indeed leave to amend "shall be freely given when justice so requires." Iowa R.Civ.P. 88. The rules of civil procedure are applicable to proceedings for judicial review of agency action so long as they do not conflict with a particular provision of the IAPA. Iowa R.Civ.P. 331. The pleading requirements for a judicial review petition are spelled out in Code section 17A.19(4). Value concedes this section does not address whether it is permissible to amend such a petition, so, unless something else in the IAPA renders it inconsistent, Rule 88 applies. We find no such other provision in the chapter. Indeed we find evidence of consistency.

■ As we have already explained, Code section 17A.19(7) affords a court discretion to receive and consider additional evidence when reviewing "other agency action." In such instances the situation becomes analogous to an original action, where the issues may develop and change in the course of presenting evidence and making proof. *See Kohorst v. Iowa State Commerce Comm'n,* 348 N.W.2d 619, 621 (Iowa 1984) (finding the converse true in judicial review of contested cases because additional evidence may not be considered by the district court on appeal). This analogy suggests Iowa rule of civil procedure 88 is consistent with the IAPA. The fact that we have found it proper to grant a motion for a more particularized statement strengthens this suggestion. *See id.* To allow respondents to request a more specific statement but at the same time prohibit petitioners from amending their petitions would be illogical and inconsistent. We therefore hold a district court may grant a party on judicial review (other than in a contested case) leave to amend the pleadings, and we also find the district court here did not abuse its discretion in granting Medco's application.

### V. *Value's disqualification.*

Value's challenge to the order disqualifying it raises two questions: (1) whether the disqualification was called for; and (2) whether disqualification was to be determined by the agency as a mixed question of law and fact or—as it in fact was—by the court as a matter of law. The first question is much easier to answer than the second.

■ Value's challenge to its disqualification is based on several grounds. To begin, Value contends the district court did not apply the correct legal standard in testing for the existence of a conflict of interest. We have not previously set such a standard. In setting about to do so we bear in mind the general observation that competitive bidding statutes are enacted "for the protection of the public to secure by competition among bidders, the best results at the lowest price, and to forestall fraud, favoritism, and corruption in the making of contracts." *Istari Constr., Inc. v. City of Muscatine,* 330 N.W.2d 798, 800 (Iowa 1983); *Elview,* 373 N.W.2d at 141. The common law did not mandate that public contracts be let upon competitive bidding, rather the requirement is purely statutory and must be considered under the legal authority of the particular governmental entity in question. *Cf.* 72 C.J.S. *Public Contracts* § 8 (1975 & 1995 Supp.). Our analysis therefore begins with the statutory provisions and administrative rules which govern DHS.

We have already mentioned that the General Assembly directed DHS to award a contract for Medicaid managed mental health care through a competitive bidding process. *See* 1994 Iowa Acts ch. 1199, § 39; Iowa Admin.Code r. 441–88.62(2). The legislation did not provide DHS with any specific instructions on how to carry out this task, but the department is not entirely without statutory guidance. Iowa Code section 249A.4 explains:

> The director shall be responsible for the *effective and impartial administration* of this chapter and shall, in accordance with the standards and priorities established by this chapter, by *applicable federal law, by the regulations and directives issued pursuant to federal law,* by applicable court orders, and by the state plan approved *in accordance with federal law,* make rules,

establish policies, and prescribe procedures to implement this chapter. Without limiting the generality of the foregoing delegation of authority, the director is hereby specifically empowered and directed to:

. . . .

(4) Have *authority to contract* with any corporation authorized to engage in this state in insuring groups or individuals for all or part of the cost of medical, hospital, or other health care or with any corporation maintaining and operating a medical, hospital, or health service prepayment plan under the provisions of chapter 514 or any health maintenance organization authorized to operate in this state, for any and all of the benefits to which any recipients are entitled under this chapter to be provided by such corporation or health maintenance organization on a prepaid individual or group basis.

(Emphasis added.) The statute thus directs DHS, in its impartial administration of the state Medicaid program, to follow federal law concerning the procurement process for the managed mental health care contract.

Appendix G, section 10 of 45 C.F.R. part 74 states the rule of the department of health and human services (HHS), DHS's federal counterpart, concerning procurement selection procedures:

All procurement transactions, regardless of whether by sealed bids or by negotiation and without regard to dollar value, shall be conducted in a manner that provides maximum, open and free competition consistent with this attachment. Procurement procedures shall not restrict or eliminate competition. Examples of what is

considered to be restrictive of competition include, but are not limited to: (1) placing unreasonable requirements on firms in order for them to qualify to do business, (2) noncompetitive practices between firms, (3) *organizational conflicts of interest,* and (4) unnecessary experience and bonding requirements.

(Emphasis added.)[5] This section does not define the term "organizational conflict of interest." The term is however defined in the federal acquisition regulation (FAR)[6] this way:

*Organizational conflict of interest* means that because of other activities or relationships with other persons, a person is unable or potentially unable to render objective assistance or advice to the government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage.

48 C.F.R. § 9.51 (1995). The FAR further states:

An organizational conflict of interest may result when factors create an *actual or potential conflict of interest on an instant contract,* or when the nature of the work on the instant contract creates an *actual or potential conflict of interest on future acquisition.* In the latter case, some restrictions on future activities of the contractor may be required.

48 C.F.R. § 9.502(c) (emphasis added).

Contracting officials are directed to identify potential organizational conflicts of interest early in the procurement process and to avoid, neutralize, or mitigate those conflicts

---

**5.** Appendix G was subsequently removed and reserved when HHS revised part 74. 59 Fed. Reg. 43,776 (1994).. A similar provision can now be found at 45 C.F.R. § 74.43 (1995).

**6.** In its statement of purpose, the FAR states:
The federal acquisition regulations system is established for the codification and publication of uniform policies and procedures for acquisitions by all executive agencies. The federal acquisition regulations system consists of the federal acquisition regulation (FAR), which is the primary document, and agency acquisition regulations that implement or supplement the FAR. The FAR system does not include inter-

nal agency regulations of the type described in 1.301(a)(2).
48 C.F.R. § 1.101; *see also id.* at § 9.502(b) (applicability of this regulation not limited to any particular type of acquisition). HHS is an executive agency, and therefore its procurement decisions are subject to the terms of the FAR. *See* 5 U.S.C.A. § 101 (1988). By operation of Iowa Code § 249A.4, the FAR appears to set forth the federal regulatory guidance governing the conflict-of-interest question at issue here. *See also* Iowa Code § 4.6(4) (when construing a statute the court may consider laws upon the same or similar subjects).

before awarding the contract. *Id.* § 9.504(a)(1), (2). Disqualification of a bidder is appropriate where the existence of a conflict of interest cannot be avoided or mitigated. *Id.* § 9.504(e). Recognizing that allegations of conflicts may arise in factual situations not expressly addressed in ·the FAR sections (to be discussed below), contracting officials are advised to examine each situation individually and to exercise "common sense, good judgment, and sound discretion" in resolving the matter. *Id.* § 9.505. The underlying goal is to prevent (1) the existence of conflicting roles that might bias a contractor's judgment, and (2) unfair competitive advantage. *Id.*

As previously indicated, the FAR describes a number of situations in which an organizational conflict of interest may arise. These situations may be grouped into three broad categories. The first category consists of those instances where a firm, by virtue of its performance of a government contract, has to some degree set the "ground rules" for the government contract at issue by, for instance, writing the work statement or drafting the contract specifications. §§ 9.505–1, 9.505–2. In such cases the concern is that the firm could either skew competition in favor of itself when developing the terms of the procurement, or, through its inside knowledge of the agency's requirements, gain an unfair advantage in the competitive bidding process. *Aetna Gov't Health Plans, Inc.; Foundation Health Fed. Serv., Inc.,* 74 Comp.Gen. ___, ___ (1995).

The second category encompasses those situations where a firm's work under one government contract might require an evaluation of its own performance under another government contract. 48 C.F.R. § 9.505–3. In these types of cases, the firm's ability to impartially render objectivity can be questioned. *See Aetna,* 74 Comp.Gen. at ___.

The third category involves circumstances in which a firm has access to nonpublic information as part of its performance of an earlier government contract that may provide it with a competitive advantage in the current government contract in question. 48 C.F.R. § 9.505–4; *Aetna,* 74 Comp.Gen. at ___.

The present allegations involve the first and third of these categories.

 Cases interpreting FAR require a moderate level of proof to establish a violation. On the one hand a bidder may be disqualified based on an "appearance of impropriety" where the bidder may have gained an unfair competitive advantage through an actual or potential conflict of interest in the procurement process. *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 200 (1990). On the other hand mere conjecture, innuendo, or speculation of an actual or potential conflict of interest, without factual support, provide no basis for disqualification. *Informatics Gen. Corp. v. Weinberger,* 617 F.Supp. 331, 334 (D.D.C.1985); *NES Gov't Serv., Inc.; Urgent Care, Inc.,* B–242358, Oct. 4, 1991, 91–2 CPD ¶ 291; *Eagle Research Group, Inc.,* B–230050, May 13, 1988, 82–2 CPD ¶ 123. The degree of evidence sufficient to support disqualification has been described this way:

> It is true that a determination to exclude an offeror must be based on hard facts, rather than mere suspicion. *Clement Int'l Corp.,* B–255304.2, 94–1, April 5, 1994, CPD ¶ 228; *see also CACI, Inc.–Fed. v. United States,* 719 F.2d 1567 (Fed.Cir. 1983). The facts that are required, however, are those which establish the existence of the organizational conflict of interest, not the specific impact of that conflict. Once the facts establishing the existence of an organizational conflict of interest are present, reasonable steps to avoid, mitigate, or neutralize the conflict are required without further need for "hard facts" to prove the conflict's impact on the competition. Where, as here, the facts demonstrate that an organizational conflict of interest exists, the harm from that conflict, unless it is avoided or adequately mitigated, is presumed to occur.
>
> . . . .
>
> [Furthermore,] [t]here is a presumption of prejudice to competing offerors where an organizational conflict of interest (other than a *de minimis* matter) is not resolved. Organizational conflicts of interest call into question the integrity of the competitive procurement process, and, as with other

such circumstances, no specific prejudice need be shown to warrant corrective action. *See, e.g., NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986); *Compliance Corp. v. United States,* 22 Cl. Ct. 193 (1990), *aff'd,* 960 F.2d 157 (Fed.Cir. 1992). For that reason, we have sustained a protest where the awardee obtained its competitor's information improperly, even though that information may not have given the awardee a competitive advantage. *Litton Sys., Inc.,* 68 Comp.Gen. 422 (1989), 89–1 CPD ¶ 450.

*Aetna,* 74 Comp.Gen. at ____. These principles of federal law necessarily control our answer to Value's two disqualification questions.

In answer to the first of them, we think the district court clearly applied the correct legal standard for determining the existence of a conflict of interest. Value contends a mere appearance of impropriety is insufficient to support disqualification, that an *actual* conflict of interest must be shown. This argument was rejected in *NKF Engineering, Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986) (appearance of impropriety sufficient to disqualify if based on facts and not mere innuendo). The rule that an appearance of impropriety provides a sufficient basis for disqualification stems from the government's strict policy in avoiding conflicts of interest. *Radiation Safety Serv., Inc.,* B–237138, Jan. 16, 1990, 90–1 CPD ¶ 56. We hold the district court utilized the correct legal standard.

 Value next asserts that, regardless of the legal standard, the district court had no factual basis upon which to conclude an organizational conflict of interest existed. Value thus argues its disqualification must be reversed and the initial agency determination affirmed. We reverse the agency's decision only under the circumstances listed in Iowa Code section 17A.19(8). In reviewing the merits of Value's assignment, we consider both the administrative record and the additional evidence presented to the district court. *Community Action Research Group,* 275 N.W.2d at 219.

Contrary to Value's assertion, the evidence supporting disqualification was overwhelming. Pursuant to the discovery order, Medco established a paper trail detailing the conflict of interest. To briefly summarize, on November 23, 1993, two DHS staff members (Donald Herman and Nan Foster Riley) held a telephone conference with Lewin's vice president (Robert Atlas) concerning a policy analysis for managed mental health care in Iowa. The DHS staffers explained the policy analysis could potentially be a springboard for an RFP and procurement, and they told Lewin's vice president that contractors doing policy analysis on mental health "must assure us that they won't, or their company won't, be a bidder." The vice president responded that this was unlikely because Lewin's affiliated company (Value) had not previously entered the Medicaid arena.

In a letter dated December 3, 1993, from DHS to Lewin, DHS confirmed to Lewin that it intended to go forward with a managed mental health care program for Medicaid recipients in Iowa, and asked if Lewin could prepare a feasibility study which might be extended into the actual preparation of an RFP and procurement of a contractor. DHS repeated the caveat mentioned during the recent telephone conference:

> It will, of course, be necessary to limit your involvement in the RFP if you or your parent company or Unisys Corporation anticipate bidding on the mental health management contract. Please let us know the following as soon as possible: (1) is Lewin, its parent company, or any of its subsidiaries, or the Unisys Corporation planning to submit a proposal in response to the RFP which will be released as a result of this project?; (2) is Lewin willing/able to begin the policy analysis immediately in order to accommodate the projected timeframes?

Contrary to its initial belief, Lewin soon became aware Value would submit a bid. Because of the potential conflict of interest, Lewin surreptitiously sought the assistance of HMA. A December 17, 1993, letter from Lewin's vice president to an HMA principal (Sally Hetrick)—which has become known as the "pickle memo"—contained the following message: "Also, FYI, Unisys and Value Behavioral Health are teaming up to bid. I'm

trying hard to avoid getting in a pickle. You may play a key role. Let's talk Monday about S and other items."

This letter is significant for several reasons. Lewin had a preexisting business relationship with HMA, and at the time the two were working together on Medicaid programs in Connecticut and Montana. Lewin also had recently (on December 8, 1993) entered into a subcontract with HMA for assistance on the Iowa project.

Lewin's plan to use HMA to avoid a conflict of interest on the Iowa managed mental health care contract came to fruition in a letter to DHS dated December 23, 1993. Lewin's vice president wrote:

In our recent discussions concerning the new mental health initiative, you asked me what it would cost for Lewin to help on a number of tasks, specifically:

(1) Policy analysis to help the department complete program specifications.

(2) Preparation of an application for a federal waiver.

(3) Computation of the mental health services capitation rate.

(4) Preparation of an RFP.

(5) Defining bidder evaluation criteria and assisting in reviewing proposals.

Since Lewin's sister company, Value, is planning to bid on the mental health contract, it would be inappropriate for us to work on tasks four and five. We have, therefore, asked HMA to give you a quote for their assistance on those tasks. On the earlier tasks, our view is that we could provide the assistance you need and not have a conflict. We have already established an embargo on communications between Lewin and Value with regard to all Iowa matters.

Two observations are notable. First, nothing in the record suggests Lewin disclosed its business relationships with HMA to DHS. In light of the "pickle memo," this omission is suspect. Second, the self-proclaimed "embargo" did not bar communications between Unisys—a potential bidder—and its subcontractor, Lewin.

On January 5, 1994, DHS entered into a contract with HMA to draft the RFP for the Medicaid managed mental health care plan of Iowa, a service Lewin said it could not provide because of a conflict of interest. The contract between DHS and HMA, however, contains no conflict-of-interest provision. Furthermore, there was no embargo on communications between HMA and Lewin.

In a related development, on March 2, 1994, Unisys returned to DHS a contract amendment originally dated January 10, 1994, expanding the responsibilities of Unisys to include consulting on additional managed health care matters. In the cover letter, a Unisys representative explained:

As we discussed this date, the work assigned under task ten will be performed exclusively by Lewin, our subcontractor. Thus, all information (deliverables, reports, documentation, etc.) will be their product and Unisys will not receive, provide input to, or assess their work in any way.

This letter has been characterized as a second embargo on communications (this time between Lewin and Unisys) in connection with the Iowa program, and was apparently intended to plug the gap in the first embargo. By this time, however, Unisys had already teamed with Value to submit a bid on the project, the feasibility aspects of the mental health care project had already been completed by Lewin, and HMA was working on the RFP. Its effectiveness, therefore, is questionable.

Finally, on March 11, 1994, DHS issued the RFP prepared by HMA. The RFP favored the technical criteria of the bids over the cost criteria. Particularly, the bids were required to be within a range of eighty-six to eighty-eight percent of the projected cost for an unmanaged health care system. This narrow two percent range effectively eliminated the role of price in the bidding process. In contrast, the RFP required a proposal to meet a 340–point threshold score out of a possible 400 points regarding technical criteria before a vendor's bid could receive further consideration (i.e., before its cost bid would be reviewed). The requirements were developed because of DHS's understandable desire for quality care in a managed system, and the determination, after consultation

with HMA, that any bid below the eighty-six percent floor necessarily sacrificed quality in favor of cost savings. We have already mentioned the expert who believed that this de-emphasis on cost incidentally benefitted less experienced bidders (such as Value) over those bidders with more experience in the Medicaid managed health arena (such as Medco).

This evidence convincingly demonstrates an "appearance of impropriety" that tainted the procurement process. The interrelationships between Unisys, Lewin, HMA, and Value, coupled with the unique position each entity occupied, creates what one authority described as "a certain aroma that is hard to purify." *NKF Eng'g*, 805 F.2d at 377. The district court here described the dilemma this way:

> Value Health should not be allowed to make money through [one subsidiary] Lewin advising the state on implementing managed mental health care and through [another subsidiary] Value obtaining the contract. Bidders should not be left to wonder if another bidder's relationship with state contractors provided a competitive advantage.

■ Value nevertheless insists that, because there is no direct evidence that the voluntary embargo with Lewin was violated (a point on which the district court agreed), a conflict of interest cannot be said to have occurred. This argument reflects a misunderstanding of the nature of organizational conflicts of interest. "While a 'Chinese wall' arrangement may resolve an 'unfair access to information' conflict of interest, it is virtually irrelevant to an organizational conflict of interest involving potentially impaired objectivity." *Aetna*, 74 Comp.Gen. at ___. Here the only parties who worked on the RFP development process—Lewin (providing policy analysis which served as a "springboard" to the RFP) and HMA (actual preparation of the RFP)—had a direct (subsidiary) or indirect (undisclosed business relationship with the subsidiary) relationship respectively to the (initially) successful bidder, Value. Each occupied a position to advise DHS in a potentially biased manner so as to enhance Value's chances of obtaining the contract. It therefore appears that an organizational conflict of interest existed that provided Value with an unfair competitive advantage in the procurement process.

■ When we reach the second disqualification question, we come to Value's strongest argument for reversal: whether disqualification should have been ordered as a matter of law. Value correctly notes the regulations did not mandate disqualifications for every actual or potential organizational conflict of interest. Indeed, as mentioned, contracting officials are directed to take steps to avoid *or mitigate* conflicts of interest. *See* 48 C.F.R. § 9.504. We have already mentioned this was not sufficiently accomplished here through Lewin's voluntary and unenforceable promises of communications embargos.

But the question recurs: is this a determination that is properly for a court to make, especially in light of the deference courts owe to administrative agencies? Or is this one of those situations, recognized in *Aetna*, where an organizational conflict of interest is incapable of mitigation? 75 Comp.Gen. at ___ ("[W]here the integrity of the system is at issue, the honesty and good faith of the individual actors cannot render behavior permissible where it would otherwise be improper. For this reason, an agency's confidence in an individual contractor's probity cannot eliminate or mitigate what would otherwise be an organizational conflict of interest.") (footnote omitted). In the final analysis the question, as is true with many questions we face, comes down to a matter of degree. When it wrestled with this issue, the district court had to ponder, just as we have, whether it could affirm on still another further review proceeding following still another remand, if the agency again awarded the contract to Value.

Just as the district court was, we are satisfied this conflict was of the sort that could neither be avoided nor mitigated. Persons or enterprises bidding on public contracts must do so on a level playing field. The field here, when all facts finally came to light, did not appear level because of one bidder's (Value's) relationship with insiders who helped superintend the process for receiving and

evaluating the bids. Because of the *appearance* of a conflict of interest, it will not suffice to tell other bidders not to worry because of the niceties of self-structured embargoes. The case involves an organizational conflict of interest that was incapable of mitigation.

The district court was therefore correct in holding as a matter of law that Value was disqualified.

What we have said makes it unnecessary to discuss other contentions.

**AFFIRMED.**